**In the Matter of B. D. INTERNATIONAL DISCOUNT CORP., Debtor.**

**Bankruptcy No. 81 11019.**

United States Bankruptcy Court, S. D. New York.

Nov. 25, 1981.

Orenstein, Snitow, Sutak & Pollack, P. C.,
Siegel, Sommers & Schwartz, New York
City, for debtor; S. Edward Orenstein, William Pauley, III, & Leonard Schwartz, New
York City, of counsel.

Milbank, Tweed, Hadley & McCloy, New
York City, for Chase Manhattan Bank;
Briscoe R. Smith, Alan W. Kornberg, and
Suzanne McSorley, New York City, of counsel.

## OPINION AND DECISION ON CONTESTED INVOLUNTARY PETITION

BURTON R. LIFLAND, Bankruptcy Judge.

Chase Manhattan Bank (National Association) ("Chase") filed an involuntary petition in bankruptcy, 11 U.S.C. § 303(b), seeking the entry of an order for relief under Chapter 7 (liquidation) of the Bankruptcy Reform Act of 1978 (the "Code")[1] against B. D. International Discount Corporation ("B. D. International"), a now dormant dealer in bankers acceptances and other money market instruments, on May 13, 1981. The gravamen of the petition alleges that the proposed debtor is liable to Chase for some seven million plus dollars mistakenly credited to the account of B. D. International in three separate banking transactions. In an attempt to elide the proceeding, B. D. International moved for dismissal of the involuntary petition on the ground that Chase is an ineligible petitioner because its claim is "contingent as to liability", 11 U.S.C. § 303(b)(1),[2] or, in the alternative, for the Court to abstain pursuant to 11 U.S.C. § 305.[3]

■ Following two hearings, this Court declined to grant either branch of B. D. International's motion, *In Re B. D. International Discount Corp.*, 13 B.R. 635 (Bkrtcy.S. D.N.Y.1981), finding instead that (1) while disputed, the Chase claim is not contingent as to liability; (2) that Chase is not the sole creditor in this case; (3) that even if Chase were the sole creditor, special circumstances had been displayed which made bankruptcy administration appropriate;[4] and (4) that abstention was not in the best interest of creditors because of the spectre of fraudulent activities. The debtor was permitted to file an answer[5] limited to the grounds

1. The Bankruptcy Act of 1898 (the "Act") has been superseded by the Bankruptcy Reform Act of 1978, Pub.L. 95–598, 92 Stat. 2549, as of October 1, 1979. The law relating to bankruptcy is codified in title 11 of the United States Code.

2. Chapter 3 applies in cases under Chapter 7 by the force of 11 U.S.C. § 103(a). In pertinent part, § 303(b)(1) states:
 (b) an involuntary case is commenced by the filing with the bankruptcy court of a petition under Chapter 7 or 11 of this title—
 (1) by three or more entities, each of which is either a *holder of a claim against such person that is not contingent as to liability* . . . (emphasis added)
 \* \* \* \* \* \*
 See, 11 U.S.C. §§ 101(4) ("Claim"), (14) ("Entity"), (30) ("Person"), (31) ("Petition"); 102(2) ("claim against the debtor").

3. § 305 Abstention
 (a) The court after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
 (1) the interests of creditors and the debtor would be better served by such dismissal or suspension; or
 \* \* \* \* \* \*
 See, 11 U.S.C. §§ 102(1) ("After notice and a hearing"); 101(9) ("creditor"), (12) ("debtor").

4. Key among these circumstances was a November 6, 1980 transfer of $4.3 million out of the country to B. D. International's sole shareholder/parent, Segrex, S.A., a Swiss corporation, and a subsequent $710,000 loan to Segrex in April of 1981, this latter transaction apparently consisting of funds similar to those that had gone into an escrow fund established by B. D. International when it ceased doing business.[a] In the interim, a new entity, B. D. Discount of America was created and engages in the same type of business as B. D. International. Chase alleges that these combined actions are part of a fraudulent scheme by those in control of B. D. International who with knowledge that they held Chase's money went about stripping B. D. International of its assets while they continue in business without the burden of obligations to creditors through B. D. Discount of America. 13 B.R. at 638.
 (a) See note 24 *infra*; Slater aff'd para. 8, Snitow aff'd para. 11 (Exhibit 2).

5. "An involuntary case is in essence a civil suit requesting a judgment that an order for relief be entered based on the provision of § 303(h)(1) and (2)."
 *In re Alpine Lumber and Nursery*, 13 B.R. 977, 979 (Bkrtcy.S.D.Cal.1981)
 The sought after "order for relief", 11 U.S.C. § 102(6), (a phrase that supplants the term "adjudication" under the former Act, § 1(2), (former) 11 U.S.C. § 1(2)) must be granted unless the "debtor", 11 U.S.C. § 101(12), (formerly referred to as the "bankrupt" in liquidation under the Act, § 1(4), (former) 11 U.S.C. § 1(4)) timely controverts the petition. See *Matter of Nina Merchandise Corp.*, 5 B.R. 743, 2 C.B.C.2d 1098, 6 B.C.D. 910, Bankr.Law R. (CCH) P67, 689 (Bkrtcy.S.D.N.Y.1980).

set forth in 11 U.S.C. § 303(h)(1) & (2).[6] An appeal followed.

On review in the district court[7] before the presiding Part I Judge, the Honorable Abraham D. Sofaer dismissed B. D. International's appeal[8] of this Court's interlocutory order. The appeal apparently stemmed from misplaced concern that further challenge to the bona fides of the Chase claim had been foreclosed by this Court's preliminary determinations under 11 U.S.C. § 303(b). The District Court appropriately interpreted this Court's opinion as not precluding B. D. International from later contesting the validity of the Chase claim under 11 U.S.C. § 303(h)(1), as opposed to the threshold limitation on filings by those holding claims "contingent as to liability" of 11 U.S.C. § 303(b)(1), a "thorny" issue earlier dealt with extensively in *Matter of Covey*, 650 F.2d 877, 882–884, 4 C.B.C.2d 719, 7 B.C.D. 1969, Bankr.Law R. (CCH) para. 67, 851 (7th Cir. 1981).

Thereafter, B. D. International filed a padded answer and jury demand, which upon the motion of Chase was truncated by this Court's striking of those counts that exceeded the scope of the permitted response (outlined at 13 B.R. 640). An evidentiary hearing based upon the statutory grounds set forth in 11 U.S.C. § 303(h)(1) & (2)[9] followed on October 16 and 19, 1981, without a jury.[10] Chase's presentation consisted of testimony by William Aimetti, the Group Executive responsible for the Securities Services Group at Chase; books and records produced by B. D. International;[11] memoranda prepared by Chase officials; and various affidavits and documentation from the record in this case. The debtor apparently relying upon its assumption that the petitioning creditor failed to meet its burden of proof rested at the conclusion of Chase's case without presenting any further evidence or witness testimony.

B. D. International's position in contravention of an order for relief can be summarized thusly: (1) Chase did not prove its debt; the evidence submitted was insufficient; (2) If there was a debt, Chase did not show the terms of payment or the time it expected the debt to be paid; (3) A single overdue debt cannot satisfy the standard of generally not paying debts as they become due. As will be demonstrated, none of these arguments is persuasive.

At the outset, the Court must focus on the question of what did Chase, the petitioning creditor, have to show in order to succeed, and did it make this necessary showing? Stated differently, just how far did Chase have to go to carry the day?

This is a proceeding pursuant to 11 U.S.C. § 303(h) to determine the appropriateness of commencing an involuntary bankruptcy case, not, as B. D. International would prefer, an objection to a claim made during the ordinary course of bankruptcy administra-

---

**6.** (h) ... (A)fter trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due; or

(2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

See, 11 U.S.C. §§ 101(12) ("Debtor"), (31) ("Petition"), (11) ("debt"), (10) ("Custodian"), (28) ("lien"); 102(6) ("order for relief").

**7.** See 28 U.S.C. § 1334. Bankruptcy Appeals (District Courts).

**8.** Treated as an application for leave to appeal under Interim Rule of Bankruptcy Procedure 8004(d) (adopted as S.D.N.Y. local bankruptcy rules). See District Court transcript, September 8, 1981, at 14.

**9.** At trial Chase was permitted to amend its involuntary petition to include 11 U.S.C. § 303(h)(2) (property in hands of a custodian); See Fed.R.Civ.P. 15, Bankruptcy Rule 715. See note 6, *supra*.

**10.** See 28 U.S.C. § 1480(b), (Jury Trials); *In re Liza Chong*, 16 B.R. 1, 2 C.B.C.2d 1037, 6 B.C.D. 865 (Bkrtcy.Haw.1980).

**11.** See Interim Bankruptcy Rule 1008, (discovery in support of an involuntary petition); *In re Petrotex Minerals, Inc.*, 5 B.R. 29, 1 C.B.C.2d 1065, 6 B.C.D. 357 (Bkrtcy.N.C.Ga.1980).

tion. It follows that the proffered proof in this instance must be measured with an eye to the charge of the Code for speedy resolution of the involuntary bankruptcy question. See Interim Bankruptcy Rule 1009 which commands a determination at the earliest practicable time".

The District Court implicitly recognized the tension between the need for prompt resolution to protect creditors and potential harm to an involuntarily petitioned debtor vindicated by a favorable determination of a disputed debt in subsequent litigation when it articulated:

> ... (T)he Bankruptcy Judge should be doing something to permit himself at least to know that there is at least a substantial basis for the debt, something like that, even if it is not a definitive determination that the debt is owing.

September 8, 1981 transcript at 21, District Court, Part I, Hon. Abraham D. Sofaer. While no doubt an improvidently filed involuntary petition (i.e.: by one without a valid claim) can wreak havoc on an innocent debtor, this potential harm must be juxtaposed with the need to ensure that earnest creditors promptly receive all of the rights and protections afforded by the bankruptcy laws, lest the assets of the estate be squandered and secreted away by a financially troubled or dishonest debtor. See Report of the Commission on the Bankruptcy Laws of the United States (1973) Part I at 186. Whatever solace it may provide, Congress did provide in 11 U.S.C. § 303(i) [12] remedy for an aggrieved debtor ultimately success-

ful in setting aside the scarlet letter of involuntary bankruptcy proceedings. Clearly, this puts the errant involuntary petitioning creditor at substantial risk.

The most recent exposition in the area, and the only court of appeals ruling, comes from the Seventh Circuit.

In *Matter of Covey*, 650 F.2d 877 (7th Cir. 1981), the Circuit Court was faced with the argument that "disputed" debts should not be examined in determining whether the debtors were generally paying their debts as those debts became due.[13] It resolved that policy considerations do not support a universal rule of inclusion or exclusion and constructed the following test.

> Thus, disputed debts should be excluded from the "generally paying debts" determination only under the following circumstances: 1) the dispute is whether any claim exists, not merely regarding the amount of a claim; 2) the dispute can be examined without substantial litigation of legal or factual issues; and 3) the interests of the debtor in defeating an order of involuntary bankruptcy outweigh creditors' interests in achieving a somewhat more rapid determination of the involuntary bankruptcy question.

*Id.* at 883–884. Should the proposed debtor prevail under this test, "... then the bankruptcy courts should reach the 'dispute' issue." *Id.* In other words, proceed to probe the merits of the claim. During this collateral litigation, "(i)f the *debtor* does establish that the entire debt is barred or otherwise invalid, then the disputed debt should

---

**12.** 11 U.S.C. § 303(i). If the court dismisses a petition under this section other than on consent of all petitioners and the debtor, and if the debtor does not waive the right to judgment under this subsection, the court may grant judgment—

 (1) against the petitioners and in favor of the debtor for—

 (A) costs;

 (B) a reasonable attorney's fee; or

 (C) any damages proximately caused by the taking of possession of the debtor's property by a trustee appointed under subsection (g) of this section or section 1104 of this title; or

 (2) against any petitioner that filed the petition in bad faith, for—

 (A) any damages proximately caused by such filing; or

 (B) punitive damages.

See Note 16 *infra*.

**13.** That those with disputed debts are eligible petitioners under 11 U.S.C. § 303(b) has been put to rest and is not at issue in the instant proceeding. See *Covey*, 650 F.2d at 881; *In re All Media Properties, Inc.*, 5 B.R. 126, 2 C.B. C.2d 449, 6 B.C.D. 586 (Bkrtcy.S.D.Tex.1980); *In re Duty Free Shops Corp.*, 6 B.R. 38 (Bkrtcy. S.D.Fla.1980); *In re McNeil*, 13 B.R. 434 (E.D. Tenn.1981); *In re B. D. International Discount Corp.*, 13 B.R. 635, 638 (Bkrtcy.S.D.N.Y.1981, Lifland, B.J.).

be excluded from the 'generally paying debts' calculation." *Id.* (emphasis added).

The Circuit Court, having set down guidelines for the bankruptcy court, proceeded to review their application in the *Covey* case. Noting first that the nature of the debtors' disputes with respect to certain claims "are not so clear", the court concluded that those disputes require complex factual investigations negating the need to balance interests. Notwithstanding this determination the court continued:

> But even if the creditors' interests were balanced against the debtor's interests, the result of that balancing process does not support the (debtors) position. First, a *strong factor* weighing against the (debtors) is that they *had voluntarily closed their dealership.* There was no ongoing business to be harmed by the stigma of an involuntary bankruptcy.
>
> *Second, the (debtors) disputes seem to represent strategic gamesmanship.* The (debtors) are not disputing some of their business debts.... Rather, the (debtors) are disputing 99½% of their business debts. Thus we conclude that the (debtors) interests do not outweigh the interests of the creditors in an expeditious determination of the bankruptcy question *in order to avoid waste of assets.*

*Id.* at 884. (Emphasis Added).

■ Following the lead of *Covey* this Court likewise concludes that the "nature" of the instant dispute raised by the debtor (without testimonial explication) is not so clear and that complex questions of law and fact regarding banking transactions and negligence allegations must be sorted out and resolved.[14] Moreover, in gratuitously examining a balancing test, it is readily apparent that creditors' interests far out-

weigh any danger of harm to the proposed debtor. First, the fact that B. D. International has voluntarily ceased to do business is a "strong factor weighing against (it)." B. D. International's remaining acknowledged tangible assets of $240,000 are held under unknown conditions in an attorney's escrow account.[15] Nor can several serious allegations made earlier by Chase of irregularities in the conduct of business by B. D. International be ignored, including the alleged operation of B. D. International business by a new entity whose alleged purpose is to function without the bother of the obligations of its predecessor and alleged transfers of substantial sums of money amounting to five million dollars to a foreign parent corporation either outright or in the guise of a loan. Such allegations must weigh heavily in favor of bankruptcy administration if creditors interests are to be safeguarded, the debtor being protected from imprudent petitioning creditors by the fear of sanctions under 11 U.S.C. § 303(i).[16] Finally, and borrowing further from *Covey,* "the (debtor's) disputes seem to represent strategic gamesmanship." In addition to its disputes with Chase, the largest claimant, B. D. International has scheduled other claimants as unidentified, or if identified, as contingent.[17] A sole acknowledged creditor was paid off post petition by third party funds[18] (a not uncommon ploy).[19]

In short, the Court concludes that the magnitude of potential harm to creditors far outweighs the interests of this debtor in seeking further delay. There is no need to fully decide the merits of the "dispute" at this juncture and *Covey* so instructs. Nor did the District Court in the appeal of this Court's prior decision require "a definitive

---

14. See July 23, 1981 Transcript (Bkrtcy.) at 5, lines 8–9 (Exhibit 3); September 3, 1981 Affidavit in Opposition of Franklyn H. Snitow.

15. See note 24, *infra.*

16. *See In re All Media Properties, Inc.,* 5 B.R. 126, 2 C.B.C.2d 449, 6 B.C.D. 586 (Bkrtcy.S.D. Tex.1980); Report of the Commission on the Bankruptcy Laws of the United States (1973) Pt. 1 at 190; See note 12 *supra.*

17. "List of Creditors with Addresses" dated July 29, 1981.

18. "Notice to Admit" and "Response", par. 7 (Exhibits 6 and 7).

19. See *Matter of Nina Merchandise Corp.,* 5 B.R. 743, 745, 2 C.B.C.2d 1098, 6 B.C.D. 910, Bankr.Law R. (CCH) p. 67, 689 (Bkrtcy.S.D.N.Y.1980).

determination that the debt is owing" but was only of the opinion that this Court should satisfy itself that there is a "substantial basis for the debt (or) something like that." While satisfaction of the hurdles in *Covey* seems adequate protection, the Court finds ample support in the record to further conclude the claim has a legitimate foundation and that it is not merely colorable.

At trial, Chase called to the stand William Aimetti ("Aimetti"), the Group Executive responsible for the Securities Services Group at the bank. Within the Group, Aimetti oversees the Federal Funds Department where B. D. International's government securities transactions were cleared. He explained that the errors which form the basis of the Chase claim occurred in 1979, but that due to improper auditing practices by Chase employees, were not discovered and related to him until November, 1980, a year later. The claimed errors consist of three separate banking transactions resulting in over-credits to B. D. International's checking account of approximately $7,200,000 in what appears to be a highly complex system of reconciliation and interaction, often processed via computer, and running through several channels of banking, including the Federal Reserve System.

The Aimetti testimony, bolstered by Chase internal memoranda kept in the ordinary course of its business, (Exhibits 13, 14, 15, 17 and 18) discloses that within the week of discovery, Chase apprised B. D. International of the errors through Rudolfo Cusamano, B. D. International's then president. Thereafter, a series of approximately half a dozen calls and meetings took place over the next two months. At the first meeting, Cusamano was provided with a detailed explanation of the Chase claim, supported by memoranda which summarized and documented with transaction records the erroneous credits (Exhibits 9, 10 and 11). The accuracy of these records was later acknowledged in a telephone conversation between Cusamano and Aimetti. The tone evinced by B. D. International during subsequent exchanges was not denial and disclaim; on the contrary, discussions centered on arriving at a mutually satisfactory schedule of repayment.

In a mid-December meeting, representatives of B.D. International informed Chase that B.D. International had suffered severe losses[20] in the preceding year and a half and was now dormant, but that certain foreign investors (unidentified) would honor Chase's claim. Chase, however, found the proposal unacceptable without some form of security such as the guarantee of a viable entity or an assignment to it of an earlier mentioned $11 million B.D. International liability reserve account. Neither protection was forthcoming, and in fact, the reserve account had evaporated by this time. Counter-proposals and counter-counter-proposals failed to find favor and apparently negotiations were terminated. Aimetti concluded his direct examination by stating that B.D. International had made no payment on the $7.2 million obligation and that Chase had no lien or security interest in the assets of B.D. International.

In addition to the above testimony, Chase introduced into evidence certain financial statements of B.D. International transmitted by counsel for B.D. International to Chase during the course of the above meetings and prepared by certified public accountants employed by B.D. International. The statement records the following liabili-

---

**20.** This is an appropriate juncture in which to reflect upon recent commentary by the Court of Appeals for this circuit in a case dealing with the fraudulent conveyance provisions of § 67(d) of the Act (former) 11 U.S.C. § 107(d), now embodied in 11 U.S.C. § 548 of the Code.

When an overburdened debtor perceives that he will soon become insolvent, he will often engage in a flurry of transactions in which he transfers his remaining property, either outright or as security, in exchange for consider-

ation that is significantly less valuable than what he has transferred. Although such uneconomical transactions are sometimes merely acts of fecklessness, the calculating debtor may employ them as a means of preferring certain creditors or of placing his assets in friendly hands where he can reach them but his creditors cannot.

*Rubin v. Manufacturers Hanover Trust Co.*, 661 F.2d 979 (2d Cir. 1981).

ty: "Payable to Bank $7,269,052." (Exhibits 19, 19A and 6).

██ The Court finds the Aimetti testimony competent and credible; the financial statement a damaging admission. In short, sufficient evidence has been adduced by Chase to meet its burden of going forward. By raising the "dispute" issue, a collateral matter, it became incumbent upon B.D. International at this juncture to "establish that the entire debt is barred or otherwise invalid," if the claim is to be excluded from the 11 U.S.C. § 303(h)(1) calculation. *See Covey, supra* at 883. B.D. International did not offer a scintilla of substantive proof to rebut the Chase claim, rather it attempted to subvert Chase's presentation with attacks pitched to the niceties of pleadings and proof. Chase clearly established a "substantial basis" for its claim and as such, it will be included in the calculation of "generally not paying such debtor's debts as such debts become due."

But what does this phrase "generally not paying such debtor's debts as such debts become due" mean? A definitive answer to this question is not to be found in the Code.

In reforming the standards of involuntary bankruptcy, Congress intended to make it easier to commence proceedings against debtors. Abolished are the "acts of bankruptcy" enumerated in § 3(a) of the Act, (former) 11 U.S.C. § 21(a), and the balance sheet test of insolvency defined in § 1(19) (former) 11 U.S.C. § 1(19). In ". . . the most significant departure from (prior) law concerning the grounds for involuntary bankruptcy . . ." an "equity insolvency test" has been substituted. House Report No. 95–595, 95th Cong., 1st Sess. (1977) 323, 324 ("House Report"); *See* Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 34 ("Senate Report"), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5820, 6280; *Cf.* 124 Cong.Rec. H 11,019 (Sept. 28, 1978); S 17,-407 (Oct. 6, 1978) (reflecting changes in later compromise); *Accord, Matter of Stebbins, Inc.,* 78 B 1087; 78 Civ. 4302 (MJ) Slip

Op. at N.13 (S.D.N.Y. Sept. 17, 1979); *Matter of Hill,* 5 B.R. 79, 82, 2 C.B.C.2d 646, 6 B.C.D. 659 (Bkrtcy.Minn.1980), *Aff'r* 8 B.R. 779, 780, 3 C.B.C.2d 920 (D.C.Minn.1981); *In re All Media Properties, Inc.,* 5 B.R. 126, 142 (N. 5), 2 C.B.C.2d 449, 6 B.C.D. 586 (Bkrtcy. S.D.Tex.1980); *In re Duty Free Shops Corp.,* 6 B.R. 38, 40, Bankr.Law R. (CCH) par. 67, 625; *Matter of Luftek, Inc.,* 6 B.R. 539, 546 (Bkrtcy.E.D.N.Y.1980); *Matter of Gill Enterprises,* 15 B.R. 328, 4 C.B.C.2d 1312, 1316 (Bkrtcy.N.J.1981); *See also* Report of the Commission on the Bankruptcy Laws of the United States, 1973, Pt. 11 at 75 ("Commission Report"); [21] 2 *Collier on Bankruptcy* (15th ed.) par. 303.11(1) at 303–27. A test that Congress assumed "the bankruptcy courts should have no difficulty in applying. . . ." House Report at 323. At least it was hoped that "(the) existence or nonexistence of this ground should be more easily determined than acts of bankruptcy. . . ." Commission Report, *supra.*

In reviewing the ever prolific body of case law developing in this area, it becomes clear that the task is not so easy and it is understandable why "it is not possible to lay down guidelines that will fit all cases." Commission Report *supra.* The seemingly endless diversity exhibited by those suffering financial distress, in earnest or feigned, calls for a broad concept that allows "bankruptcy courts enough leeway to be able to deal with the variety of situations that will arise." *All Media, supra* at 143. Not suprisingly, proposed "mechanical tests" have been rejected by the courts. *In re Reed,* 11 B.R. 755, 759, 4 C.B.C.2d 934, Bankr.Law R. (CCH) par. 68, 047 (Bkrtcy.S.D.W.Va.1981); *All Media, supra* (51% or majority test rejected); *Gill Enterprises, supra.*

In *Matter of Hill, supra,* the bankruptcy court approached the statute with a "straightforward and uncomplicated reading." Reasoning that "generally" imports something that involves or is applicable to the "whole" and with regard to the overall picture, as opposed to specific instances, it held that the "generally not paying test" is

---

**21.** The Commission draft proposed a test which looked to "prospective inability" or "past failure" to meet obligations. This approach was

abandoned in favor of an approach that looks to the debtor's present practice.

satisfied where there is nonpayment of any single claim which represents an "overwhelming portion" of the total debt, even if the claim is disputed. In this instance, one creditor was owed $1,250,000 out of approximately $1.4 million in claims. Similarly, in *In re Kriedler Import Corp.*, 4 B.R. 256, 2 C.B.C.2d 159, 164, 6 B.C.D. 608 (Bkrtcy.Md. 1980), it was held that where a debtor failed to make payments on a debt which constitutes a large percentage (here 97%) of its total debt, that debtor has failed generally to pay its debts as they became due, notwithstanding timely payment of a number of smaller debts. *Cf. Matter of Denham*, 444 F.2d 1376 (5th Cir.) (under the Act).

■ The Chase $7.2 million claim comprises greater than 98% of the total debts identified in the instant proceeding, an overwhelming proportion of the total debt. Thus, under *Hill* and *Kriedler*, sufficient grounds have been shown to justify the entry of an order for relief.

The steadfast position by B. D. International that this case concerns a single creditor or overdue debt is without foundation.[22] Response to paragraph 7 of Chase's Notice to Admit, admits that Willkie Farr & Gallagher, Esqs. had a claim ($75,000) at the time of the filing of the petition.[23] That this creditor was silenced with third party funds does not eviscerate the debt or shield it from consideration by the Court. *All Media, supra* at 144 and 145. In addition, creditors scheduled by the debtor (no matter what the debtor's strategy may have been in constructing its list pursuant to this Court's order) and proofs of claim submitted independently by creditors, see Bankruptcy Rule 301(b) (proof of claim constitutes prima facie evidence of validity and amount of claim), further dispel and make disingenuous this assertion.

Finally, the Court must reiterate, even if Chase were the sole creditor, "special circumstances" exist which justify the entry

of an order for relief. 13 B.R. at 638–639 (citing *In the Matter of 7H Land & Cattle Co.*, 6 B.R. 29, 2 C.B.C.2d 554, 6 B.C.D. 572, Bankr.Law R. (CCH) par. 67, 951 (Bkrtcy. Nev.1980) and *In re Arker*, 6 B.R. 632, 3 C.B.C. 21, 6 B.C.D. 1281 (Bkrtcy.E.D.N.Y. 1980); *see also In re R. V. Seating, Inc.*, 8 B.R. 663, 665, Bankr.Law R. (CCH) p. 67, 829 (Bkrtcy.S.D.Fla.1981); *Reed, supra* at 760 (approving "special circumstances" exception); *In re 7H Land & Cattle Co.*, 8 B.R. 22 (Bkrtcy.Nev.1980)).

B. D. International's further polemics that 11 U.S.C. § 303(h)(1)'s formulation mandates "debts", as opposed to a single debt, or "patterns" of abuse is without authority or support and is at odds with all published decisions on this issue. Its position is misplaced in literal or narrow readings of the statute and inapposite legislative history and case law, or out of context statements therefrom.

■ Lastly, relying upon *In re Trans-High Corp.*, 3 B.R. 1, 1 C.B.C.2d 509, 6 B.C.D. 213 (Bkrtcy.S.D.N.Y.1980, Ryan, B. J.), B. D. International argues: "Chase has offered no evidence establishing the terms of payment or the time that it expected its alleged debt to be paid. This failure is fatal to Chase's involuntary petition under 11 U.S.C. Sec. 303(h)(1)." Post-trial memorandum at 3–4.

But Chase's claim does not result from a sale of goods or performance of a service. There was no quid pro quo. This is a claim that stems from banking errors. Reasonable commercial practice would dictate that after notification of the over-credits, and following a reasonable period of time sufficient to verify financial records, the entire sum was immediately due. Since at least December 1980, repeated demands have been made by Chase. The record verifies that no payment has been made. Whatever a reasonable period might be, it is not five months (the period between notification

**22.** The Chase claim flows from three separate banking transactions. While Chase has made a demand for repayment in the aggregate, this does not necessarily fuse its combined demand into a "single overdue debt." The record is not sufficient in this context to comment further. The Court, however, does make mention that

were it faced with a series of sales over a period of time from a single vendor, it would hesitate to lump together several non-payments specifically identifiable to separate transactions under the rubric of "single overdue debt."

**23.** See note 18 *supra*.

and the filing of the involuntary petition). Nor does the fact that B.D. International colors its obligation with "dispute" lead to any other conclusion. The debtor has been given every opportunity to present proof that would bar the Chase claim. In contradiction to its position, B.D. International's very own books of account (Exhibits 19, 19A and 6) smart with the admission of the bank liability. See *All Media, supra* at 145.

 Finalizing its fate, the record reveals that B.D. International's cash assets have been sitting in a lawyer's escrow account since May 1981. (Exhibits 1, 2, 4, 5)[24] The nature of a debtor's conduct of his financial affairs has been viewed as a factor in the generally not paying debts determination. Winding up a business and conducting financial affairs in a manner inconsistent with one operating in good faith and in the regular course of business is conduct that may form the foundation for the entry of an order for relief. *Reed, supra* at 760. While this factor *alone* might be insufficient, given the totality of the record before the Court—the enormity of the past due debt(s), the duration of non-payment, the reduction of some assets into an escrow and concomitant non-operating status, and the "special circumstances" brought earlier to the Court's attention—ample support is found for the entry of an order for relief.[25] The petitioning creditor, Chase, has met its burden of proof under 11 U.S.C. § 303(h)(1).[26]

### THE 11 U.S.C. § 303(h)(2) CUSTODIAN OF ASSETS ALTERNATIVE[27]

The Chase effort to invoke the provisions of § 303(h)(2) merits discussion notwithstanding the totally sufficient nourishment of the petition under § 303(h)(1). Essentially Chase argues that the establishment of a custodial escrow account with the attorney

for the debtor, in which all of the debtor's cash on hand assets are held, in of itself mandates the order for relief. Indisputably, substantially all of B.D. International's present tangible assets were turned over to attorneys within 120 days of the filing of the petition. (Exhibits 1, 2, 4 and 5) The question presented then is whether the attorneys are the custodian contemplated by the statute.

"Custodian" is defined by 11 U.S.C. § 101(10) as:

(A) receiver or trustee of any property of the debtor, appointed in a case or proceeding not under this title;

(B) assignee under a general assignment for the benefit of the debtor's creditors; or

(C) trustee, receiver, or *agent* under applicable law, or *under a contract*, that is appointed or authorized to take charge of property of the debtor for the purpose of enforcing a lien against such property, or *for the purpose of general administration of such property for the benefit of the debtor's creditors* ;

(emphasis added).

The definition's legislative history explains that "custodian" is a new term introduced into the Code, "to facilitate drafting and means prepetition liquidator of the debtor's property, such as an assignee for the benefit of creditors, a receiver of the debtor's property, or a liquidator or administrator of the debtor's property." House Report at 310; Senate Report at 23, U.S. Code Cong. & Admin.News 1978, pp. 5809, 6267.

Additional legislative comment under § 303(h)(2) sheds further light on the concept.

The second test, appointment of a custodian within 90 days before the petition, is provided for simplicity. It is not a partial

---

24. See also July 23, 1981 Transcript (Bkrtcy.) at 6 (Exhibit 3); Part I District Court Transcript at 19–20, September 8, 1981, Hon. Abraham D. Sofaer presiding; October 19, 1981 Transcript (Bkrtcy.) at 32.

25. *See* sound commentary in the last three paragraphs of Honsberger, "Failure to Pay One's Debts Generally As They Become Due:

The Experience of France and Canada," 54 Amer.Bankr.L.J. 153 (Spring 1980) at 162–163.

26. Resolution of the "dispute", put at issue by B.D. International's formal denial of the Chase claim, is properly the subject of resolution in a subsequent trial on the merits.

27. See statute at note 6, *supra.*

reenactment of the acts of bankruptcy. If a custodian of all or substantially all of the property of the debtor has been appointed, this paragraph creates an irrebutable (sic) presumption that the debtor is unable to pay its debts as they mature. Moreover, once a proceeding to liquidate assets has been commenced, the debtor's creditors have an absolute right to have the liquidation (or reorganization) proceed in the bankruptcy court and under the bankruptcy laws with all of the appropriate creditor and debtor protections that those laws provide.

House Report at 323–324; see Senate Report at 34, U.S.Code Cong. & Admin.News 1978, p. 6280; see also 124 Cong.Rec. H 11091 (September 28, 1978); S 17,407 (October 6, 1978) (reflecting later changes).

 It appears, therefore, that if a debtor's assets are to be subjected to a bankruptcy-like liquidation or reorganization without the protection of the bankruptcy court or laws, creditors are entitled to circumvent such process and receive the protections afforded by the Bankruptcy Code if they act timely. *Cf. In re North County Chrysler-Plymouth, Inc.,* 13 B.R. 393, 7 B.C.D. 1409 (Bkrtcy.W.D.Mo.1981) (auctioneer not a custodian because he had no responsibility for paying the debtor's debts.) The onus was upon Chase, however, to demonstrate that the law firm is a prepetition liquidator of B.D. International's assets for the benefit of B.D.'s creditors with responsibility akin to a trustee, receiver or other similar agent or fiduciary to distribute those assets.

Chase failed to establish that the law firm had the responsibility of liquidating all or any part of the debtor's property. There is nothing in the record concerning the conditions or terms of the escrow agreement. There was nothing to indicate that B.D. International could not revest itself with the fund.

The right of a "custodian" to retain or hold property must be in derogation of the debtor's proprietary rights to the property in order to satisfy the custodial requirements of the statute.

Under these circumstances Chase has not established that a "custodian" was appointed or took possession pursuant to 11 U.S.C. § 303(h)(2).

The predicate for relief under § 303(h)(1) having been established, the Court, in conformity with Interim Rule of Bankruptcy Procedure 1009(c), is entering a separate order of relief [28] and the Clerk of the Bankruptcy Court is directed to docket same.

28. By its answer to the involuntary petition and response to Chase's Notice to Admit, B.D. International has established the following factors which satisfy this Court's jurisdictional predicates: 1) that it is a domestic corporation; 2) that its principal place of business was located in this district for the 180 days immediately preceding the filing of the petition; 3) that it is a person against whom an order for relief may be entered against under Title 11 of the United States Code; and, 4) that all the creditors of the debtor are less than twelve in number. See 11 U.S.C. §§ 109(a) and (b); 303(a) and (b)(2); 28 U.S.C. § 1472.