In re George C. HUDSON, Jr., Debtor.

In re HUDSON PRINTING & LITHO-
GRAPHING COMPANY,
INC., Debtor.

C. Kenneth STILL, Trustee, Plaintiff,

v.

George C. HUDSON, Jr., Defendant.

Bankruptcy Nos. 1–81–02312, 1–81–01053.
Adv. No. 1–81–0824.

United States Bankruptcy Court,
E.D. Tennessee.

April 6, 1983.

Scott N. Brown, Jr., Chattanooga, Tenn., for plaintiff.

Arthur C. Grisham, Jr., Chattanooga, Tenn., for defendant.

## MEMORANDUM

RALPH H. KELLEY, Bankruptcy Judge.

George C. Hudson, Jr., (Hudson) had been a stockholder, officer, director, and employee of Hudson Printing Company but sold his interest and quit working there before it filed bankruptcy on June 5, 1981. At the time of bankruptcy, the debtor's books showed that it owed Hudson about $20,000, but he owed it about $100,000.

The bankruptcy trustee for the printing company filed an involuntary bankruptcy petition against Hudson on November 17, 1981. The trustee alleged that Hudson owes the company the $80,000 debt shown by the company's books and $4,500, as the value of a car alleged to have been fraudulently transferred from the printing company to Hudson.

Hudson contested the petition on the ground that he does not owe either of the debts alleged by the trustee.

The court held two hearings on the contested involuntary petition and the complaint for recovery of the alleged fraudulent transfer. This memorandum will deal with the involuntary petition and the complaint.

The statute that controls who can file an involuntary petition speaks of holders of "claims" against the debtor, rather than creditors of the debtor. 11 U.S.C. § 303(b). There must be a certain number of petitioning claimholders, and their claims must total a certain amount. Furthermore, a claim

does not qualify if it is "contingent as to liability."

If there are fewer than twelve holders of claims against the debtor, the statute allows an involuntary petition to be filed by one claimholder whose claims total at least $5,000. At the trial, Hudson's attorney conceded that there were fewer than twelve holders of claims against Hudson. The first question, then, is whether the trustee has "claims not contingent as to liability" that total at least $5,000.

Claim is broadly defined in Bankruptcy Code § 101(4).

> [C]laim means ... right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured ....

■ The definition clearly does not require an undisputable right to payment. The courts have taken the approach that a disputed right to payment is a claim unless it is clearly barred by some defense and the alleged debtor raises the defense. On the other hand, "where the issues concerning defenses to a claim ... are not clear and require adjudication of either substantial factual or legal questions, the creditor should be recognized as qualified to join in the bringing of an involuntary bankruptcy petition." *In re All Media Properties, Inc.,* 5 B.R. 126, 134, 6 B.C.D. 586, 588, 2 C.B.C.2d 449, 457 (Bkrtcy.S.D.Tex.1980). See also *Matter of Covey,* 650 F.2d 877, 11 B.R. [101], 7 B.C.D. 1069, 4 C.B.C.2d 719 (7th Cir.1981).

■ This approach largely omits the question of how definite a claim must be in order to be considered a "claim". Perhaps a claim, such as some tort claims, that will require much litigation to determine whether the alleged debtor is actually liable should not be usable as the basis for an involuntary bankruptcy. However, it may be easier to deal with this problem as part of determining whether the alleged debtor is generally paying his debts as they become due. *Matter of Covey,* cited above. In any event, the trustee's $80,000 claim is not so indefinite that it should be excluded.

The next question is whether Hudson raised any defense that clearly bars all or part of the $80,000 claim. Hudson raised the statute of limitations as a defense. The relevant statute of limitations is either Tennessee Code Annotated § 28–3–109 or § 28–3–110. Section 28–3–109 provides a six-year limitations period. Section 28–3–110 provides a ten-year limitations period. The $100,000 account deficit on which the trustee bases his $80,000 claim accrued over a period of years, apparently beginning about 1958, though the records introduced into evidence do not go back that far. Nevertheless, it appears that more than $5,000 of the deficit was incurred within six years of the filing of the involuntary petition against Hudson. P.Ex. 6. Whichever statute of limitations applies, it does not bar enough of the trustee's claim to leave him with less than a $5,000 claim.

Since there were fewer than twelve holders of claims against Hudson, the trustee's claim based on the printing company's books is enough by itself to satisfy the statutory requirements as to the number of claimholders and the amount and character of their claims. There remains the requirement of proof that Hudson was not generally paying his debts as they became due.

■ The question necessarily arises whether a disputed claim can be counted in determining whether Hudson was generally paying his debts as they became due. Debt is defined as "liability on a claim," thus assuming that disputes have been decided against the alleged debtor to the extent of the debt. 11 U.S C. § 101(11). This definition cannot be strictly followed in determining whether an alleged debtor was generally paying his debts as they became due, since the court often could not rule on the involuntary petition without deciding all disputes as to claims on which the debtor was not making payments. The statutes were intended to simplify the process compared to the former statutes, which usually required proof that the debtor had committed an "act of bankruptcy" and was insolvent in the sense of liabilities exceeding assets. 11 U.S.C. §§ 1(19) & 21 (1976);

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 321–324 (1977); S.Rep. No. 95–989, 95th Cong., 2d Sess. 34 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. *Matter of Covey,* cited above, contains an extensive discussion of the problem. The recommended approach is not to delve deeply into the questions raised if substantial litigation will be required to decide whether the claim is a debt.

At the trial of this matter, however, the court allowed the parties to put on substantial proof on the question of Hudson's liability for the amount of the account receivable shown by the printing company's books. Having allowed the proof, the court will decide the question of Hudson's liability.

■ Payments to officers of the company were recorded in its books in various accounts according to what the payments were for. The company also maintained accounts for unclassified payments to the company's officers, including Hudson. Though these "draw" accounts were variously identified, they worked as follows. A payment to the officer was recorded in the draw account as a debit. The total accumulated debit was periodically reduced by crediting the account with salary due the officer or other debts due from the company to the officer. A debit balance at the end of the accounting year was a debt due (account receivable) from the officer to the company. The balance sheets for several years reflect a large amount of accounts receivable from officers. P.Exh. 1. There was an accounting change in 1977 that apparently resulted in converting the debit balance in Hudson's miscellaneous draw account and subsequent unclassified draws to an account receivable on the company's books. This is the account receivable on which the trustee's claim is based.

Hudson did not dispute that the books show the account receivable. He argued that the payments or withdrawals that went to make up the account should have been recorded as salary paid to him or advances to pay business expenses. The evidence can be summarized as follows.

The printing company was a family owned business. Hudson and his father and mother were stockholders and on the board of directors. Hudson's father owned a controlling share of the stock and ran the company. Hudson worked in sales and production. When Hudson's father died in 1977, Hudson acquired almost all the stock of the company and operated the business until 1980, when he sold the stock to Thomas Ganoe and his wife.

Hudson's mother testified about the actions of the board of directors. The board did not agree to lend Hudson the money. The board also did not require Hudson to sign any document admitting that he owed the account receivable. Mrs. Hudson did not contemplate that Hudson would repay any amounts paid to him in excess of salary and reimbursable expenses. She testified that the salary paid to Hudson was not enough for him to live on.

Hudson testified that some entries to the draw account were for company expenses, particularly payments to Joy's Flowers, Country Pride Foods, Wilson and Company, the Kiwanis Club, and the telephone company. He testified that school tuition payments for his sons should have been recorded as salary. Hudson also testified that he told the company's bookkeepers to take out taxes on all amounts paid to him and put them on his account, apparently his salary account since taxes were to be withheld.

When Hudson sold his interest to the Ganoes, they agreed that Hudson would serve as a consultant to the business for a fee of $1,000 per month that would be applied toward reducing the account receivable. The account receivable was reduced by eight credits for the $1,000 monthly fee. Hudson and Ganoe both testified that Hudson never actually admitted owing a debt to the company for the account receivable. Hudson did sign a written contract in which he acknowledged that he owed the debt, but the contract was drawn up by Ganoe's attorney and Hudson was not represented by an attorney.

Hudson's tax returns show that he did not report as income all amounts that he argues should have been accounted for as salary.

Some amounts charged to the account should have been accounted for as payments to cover business expenses. The main question, however, is whether the entire account receivable can be eliminated on the ground that all the payments that weren't business expenses were salary.

The absence of an express agreement to lend Hudson the money does not mean that the withdrawals were intended as salary. Likewise, whether Hudson owes the money does not depend on whether he expressly agreed to repay it.

The facts show a situation that is probably easily explained in practical terms. The Hudsons owned and operated the company. They understood that so long as Hudson didn't withdraw too much, he could make withdrawals for personal use over and above his authorized salary. See *Mutual Life Insurance Co. v. Mooreman,* 366 F.2d 686, 688 (9th Cir.1966) cert. den. 386 U.S. 959, 87 S.Ct. 1030, 18 L.Ed.2d 109 (1967). Hudson, however, failed to report these withdrawals as salary for income tax purposes. This could have led to serious tax problems for him if it became apparent that the account receivable was not really a debt or had been forgiven. Hudson's agreement to pay the account receivable by rendering consulting services to the company's new owners makes sense as a means of avoiding income tax problems by treating the account receivable as a true debt.

This reasoning leads to the conclusion that whatever money Hudson withdrew for personal uses in addition to his authorized salary was also intended as salary. Certainly, whatever such withdrawals he made while he was practically the sole shareholder must be treated as salary. *Field v. Lew,* 184 F.Supp. 23 (E.D.N.Y.1960). See also *L.R. Schmaus Co. v. Commissioner of Internal Revenue,* 406 F.2d 1044 (7th Cir.1969). His previous withdrawals were acquiesced in by the other shareholders and directors over a long period of time without any demand for payment. In these circumstances, the court cannot hold that Hudson is obligated to pay the account receivable. The result is that the account receivable cannot be counted in deciding whether Hudson was generally paying his debts as they came due.

Hudson was not paying American National Bank anything on a $20,000 claim for a deficiency due under a boat lease after repossession and sale of the boat.

Hudson disputed the bank's claim under the boat lease on the ground that the lease was executed with the understanding that he could return the boat and not be liable for any rent that accrued afterward. Hudson's attorney conceded that the bank had a claim but argued that the claim had not achieved the status of a debt.

There was little proof on the question of whether Hudson was truly indebted to the bank on its $20,000 claim. The bank's claim arose from a written lease of a boat to Hudson. Hudson argues that he had an oral agreement, apparently with the lessor, that he could return the boat at any time and not be liable for any lease payments that came due afterward. The bank's claim should be considered a debt for the purpose of determining whether Hudson was generally paying his debts as they became due. Hudson's defense depends on proof of an oral agreement contrary to the written agreement and enforceable against the bank. The success of such a defense is highly doubtful.

■ There remains the question of whether the trustee's fraudulent transfer claim was a debt owed by Hudson. Since the trial was also intended to be a trial of the trustee's fraudulent transfer complaint, the court must decide.

The printing company was listed on the certificate of title as owner of the 1977 Cadillac in question. In May, 1980, Hudson owned all but four of the shares of stock in the printing company. He entered into an agreement to sell his stock to Thomas and Ella Mae Ganoe. The agreement provided that part of the Ganoes' payment for Hudson's stock would be transfer of the 1977 Cadillac from the printing company to Hudson after the lease payments were completed. On April 14, 1981, Thomas Ganoe, on behalf of the printing company, executed a bill of sale transferring the car to Hudson. On the same day, Hudson traded the car to

Kelly Cadillac for a 1981 Cadillac. Kelly Cadillac's bill of sale showed that the car was given a trade-in value of $4,446.00. This was reduced by the payoff of a lien debt in the amount of $1,689.86. The difference between the trade-in value and the lien debt was recorded on the bill of sale as "net equity" in the amount of $2,756.14.

The company's transfer of the car to Hudson to pay for the Ganoes' purchase of the company's stock gave no consideration to the company. A transfer for inadequate consideration is recoverable if it was made within one year before the debtor's bankruptcy and if the debtor was insolvent at the time of the transfer. 11 U.S.C. § 548(a)(2).[1] The transfer on April 14, 1981, was within one year before the printing company filed its petition in bankruptcy on June 5, 1981. The next question is whether the printing company was insolvent at the time of the transfer.

The proof in the record is first that the printing company filed a petition in bankruptcy within two months after the transfer. The agreement between Hudson and the Ganoes for them to buy his stock reveals that about a year before its bankruptcy the company owed $400,000 in debts, much of the total secured by liens on the company's property. The accountant's summaries for 1979 show that the company lost over $100,000 in 1979. They also show that the balance of assets with liabilities depended on counting $80,000 in accounts receivable from officers, primarily Hudson, as valuable corporate assets. The trustee testified that the company's assets were real estate, equipment and accounts receivable, and he felt it necessary to pursue the account receivable from Hudson. If the company was solvent at the time of its bankruptcy, it probably would not have filed. The court also doubts that the trustee of a solvent corporation would pursue the former controlling shareholder for an account receivable that the company probably never intended to be collected. The court infers from these facts that the print-ing company was insolvent in April, 1981, at the time of the transfer of the car to Hudson.

Though Hudson's attorney objected to it as proof of value, the court sees no reason for assuming that Kelly Cadillac's bill of sale is inaccurate. There was no evidence to contradict it. The court concludes that the trustee should recover the net equity value as shown by the bill of sale—$2,756.14. 11 U.S.C. § 550(a).

It also follows that Hudson owes the trustee a debt of $2,756.14 on which he was not making payments at the time the trustee filed the involuntary bankruptcy petition.

The question, then, is whether Hudson's failure to make payments to the bank on its $20,000 claim and to the trustee on the fraudulent transfer debt amounted to generally failing to pay his debts as they became due.

The question is not whether Hudson was paying the majority of his creditors. The court must also consider the amount of the debts he was not paying in relation to the amount of the debts he was paying. See *In re B.D. International Discount Corp.*, 15 B.R. 755, 8 B.C.D. 744, 5 C.B.C.2d 813 (Bkrtcy.S.D.N.Y.1981); *In re Hill*, 5 B.R. 79, 6 B.C.D. 659, 2 C.B.C.2d 646 (Bkrtcy.D.Minn.1980).

Other than the debts to the bank and the trustee, Hudson apparently owed only one other "large" debt for the purchase of an automobile. He was making the monthly payments of $518 each. He also owed routine bills for clothes, gas, telephone service, and such, which he was regularly paying. However, the $20,000 debt to the bank and the debt of about $2,800 to the trustee apparently comprised a large part of Hudson's debts. He was not making payment on these debts. The court therefore concludes that Hudson was not generally paying his debts as they became due.

The court believes it is correct to enter an order for relief against Hudson based on the trustee's involuntary petition despite

---

1. The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... within one year before the date of filing of the petition, if the debtor ... received less than a reasonably equivalent value in exchange for such transfer ... and was insolvent on the date such transfer was made ....

the conclusion that Hudson is not actually indebted to the trustee on the claim that was the basis of the petition. The inquiry into whether a person has a "claim" that will support an involuntary petition should be less detailed than the inquiry into whether the alleged debtor was generally paying his debts as they became due. It is preliminary to the main question of whether the alleged debtor was generally paying his debts as they became due. The determination that Hudson does not actually owe the claim should not upset the conclusion that the claim qualifies the trustee to bring the involuntary petition.

The court will enter an order for relief and a separate judgment for the fraudulent transfer liability.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 752.