In re B.D. INTERNATIONAL DISCOUNT CORP., Debtor-Appellant.

B.D. INTERNATIONAL DISCOUNT CORP., Plaintiff-Appellant,

v.

CHASE MANHATTAN BANK, N.A., Defendant-Appellee.

No. 616, Docket 82–5031.

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1982.

Decided March 4, 1983.

Franklin Snitow, New York City (Orenstein, Snitow, Sutak & Pollack, P.C., New York City, and Siegel, Sommers & Schwartz, New York City), for plaintiff-appellant.

Briscoe Smith, New York City (Milbank, Tweed, Hadley & McCloy, New York City, Suzanne M. McSorley, New York City, of counsel), for defendant-appellee.

Before FRIENDLY and NEWMAN, Circuit Judges, and WYZANSKI,* District Judge.

FRIENDLY, Circuit Judge:

This appeal is from an order of Judge Edelstein in the District Court for the Southern District of New York, 24 B.R. 876, which affirmed an order entered by Bankruptcy Judge Lifland, 15 B.R. 755 (Bkrtcy. S.D.N.Y.1981), granting a creditor's petition for involuntary bankruptcy under § 303(b)(2) and (h) of the Bankruptcy Code. The debtor contended that the order was improperly granted on two grounds: The first was the failure of the petitioning creditor to show that the "debtor is generally not paying such debtor's debts as such debts become due". The second was that the indebtedness to the petitioning creditor was disputed. Although such questions are often difficult to resolve, and the first is a close one here, we have concluded that the bankruptcy judge and the district court correctly granted relief in this case.

B.D. International Discount Corporation (B.D.I.) was in the business of trading bankers acceptances and other money mar-ket instruments. For more than ten years B.D.I. maintained its principal bank accounts at the Chase Manhattan Bank (Chase). On three separate occasions Chase mistakenly credited B.D.I.'s checking account with sums in the massive total amount of $7,268,745.92. These incorrect credits took place on October 3, 1979, October 4, 1979, and November 16, 1979, but were not discovered by Chase until late November, 1980. In November, 1980, B.D.I. transferred a total of $4.3 million from its account at Chase to a bank in Holland for the account of its sole stockholder, Segrex, S.A., a Swiss corporation. By the end of that month, B.D.I. had ceased operating, and had transferred its remaining assets of $240,000 into its attorney's escrow account. On November 28, 1980, a new entity, B.D. Discount of America, Inc. was created. This corporation engages in the same type of business and operates at the same location as B.D.I. had done.

On December 3, 1980, Chase demanded repayment from B.D.I. A series of negotiations took place between representatives of Chase and representatives of B.D.I. During the course of the subsequent bankruptcy proceedings, it was learned that in April, 1981, B.D.I. received a $710,000 payment from a third party in settlement of litigation, and that this money was not held in B.D.I.'s attorney's escrow account but was transferred to the account of Segrex as a loan. On May 13, 1981, after negotiations between Chase and B.D.I. had proved fruitless, Chase filed an involuntary petition in bankruptcy under § 303(b)(2) seeking the entry of an order for relief under Chapter 7 (liquidation) of the Bankruptcy Code, 11 U.S.C. § 303(b)(2).[1]

---

* United States District Judge for the District of Massachusetts, sitting by designation.

1. Section 303(b) provides:

   An involuntary case is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

   (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

   (2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is voidable under section 544, 545, 547, 548, 549, or 724(a) of this title, by one or more of such holders that hold in the aggregate at least $5,000 of such claims.

B.D.I. moved that the bankruptcy court should dismiss the petition primarily on the ground that Chase did not qualify as a petitioner under § 303(b)(2) since its claim was contingent[2] or, alternatively, that the court should abstain under § 305.[3] B.D.I. also raised the question whether Chase had shown that B.D.I. was generally not paying its debts as they became due—an issue more properly reserved for the trial under § 303(h)[4]—and the bankruptcy judge dealt with this in his opinion denying the motion to dismiss, 13 B.R. 635, 638–39 (Bkrtcy.S.D. N.Y.1981), as well as in his opinion after the trial, 15 B.R. at 759–63 (Bkrtcy.S.D.N.Y. 1981). In the list of creditors B.D.I. filed pursuant to court order and Bankruptcy Rule 104(e), it named four identified creditors, whose claims were stated to be "contingent, disputed, and unliquidated" and "[t]hree or fewer Unidentified Beneficial Owners of certain GNMA pool securities (identities and addresses unknown)". The former group included Chase and Citibank, N.A. The latter appeared at the hearing and represented that it was owed "at least $2300.00" by B.D.I. *In re B.D. International Discount Corp., supra,* 13 B.R. at 639. B.D.I. conceded in open court that at the time of its motion to dismiss the petition,

the law firm of Willkie, Farr & Gallagher had been a creditor in the amount of $75,-000, *id.,* but stated that the law firm's claim had been paid by Howard O'Flynn, a former officer of B.D.I. In addition, the City of New York filed a Proof of Claim of $43,320.00 for unpaid occupancy and corporation taxes, some of which had been unpaid since June, 1977. Finding that Chase's claim was not contingent and that there was no sound basis for abstention, the Bankruptcy Judge denied B.D.I.'s motion for dismissal or abstention but permitted it to file an answer to the petition within five days "limited to the statutory grounds set forth in § 303(h)(1)(2)." 13 B.R. at 640.

Under the mistaken impression that the denial of its motion to dismiss would preclude it from contesting at the trial the validity of the Chase claim for the purposes of 11 U.S.C. § 303(h)(1), B.D.I. took an interlocutory appeal to the District Court for the Southern District of New York. That court, Sofaer, J., held that B.D.I. was not precluded from later contesting the validity of the Chase claim at the § 303(h)(1) trial, and went on to say that "the Bankruptcy Judge should be doing something to permit himself at least to know that there is at

---

2. A contingent claim is "one which the debtor will be called upon to pay only upon the occurrence or happening of an extrinsic event which will trigger the liability of the debtor to the alleged creditor and if such triggering event or occurrence was one reasonably contemplated by the debtor and creditor at the time the event giving rise to the claim occurred." *In Re All Media Properties,* 5 B.R. 126, 133 (Bkrtcy.S.D. Texas 1980).

3. This provides

    Abstention

    (a) The court, after notice and a hearing, may dismiss a case under this title, or may suspend all proceedings in a case under this title, at any time if—
    (1) the interests of creditors and the debtor would be better served by such dismissal; or
    (2)(A) there is pending a foreign proceeding; and
    (B) the factors specified in section 304(c) of this title warrant such dismissal or suspension.
    (b) A foreign representative may seek dismissal or suspension under subsection (a)(2) of this section.

(c) An order under subsection (a) of this section dismissing a case or suspending all proceedings in a case, or a decision not so to dismiss or suspend, is not reviewable by appeal or otherwise.

4. Section 303(h) provides:

    If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
    (1) the debtor is generally not paying such debtor's debts as such debts become due; or
    (2) within 120 days before the date of the filing of the petition, a custodian, other than a trustee, receiver, or agent appointed or authorized to take charge of less than substantially all of the property of the debtor·for the purpose of enforcing a lien against such property, was appointed or took possession.

    11 U.S.C. § 303(h).

least a substantial basis for the debt, something like that, even if it is not a definitive determination that the debt is owing."

■ Thereafter a trial was held pursuant to § 303(h). Chase presented persuasive testimony concerning the validity of its claim. Specifically, William Aimetti, the executive responsible for securities services at the bank carefully documented, through testimony and internal memoranda kept in the ordinary course of business, the nature of Chase's claim against B.D.I. Bankruptcy Judge Lifland found this testimony to be both "competent and credible." 15 B.R. at 762. In addition to this documentation, Aimetti testified to a telephone conversation between himself and Rudolfo Cusamano, then president of B.D.I., in which Cusamano acknowledged the accuracy of bank records which summarized and documented the three transactions that gave rise to the Chase claims but sought to arrive at a mutually satisfactory schedule of repayments, 15 B.R. at 761. Also of significance were financial statements of B.D.I., prepared by B.D.I.'s accountants, which contained the following entry: "Payable to Bank $7,269,-052." The Bankruptcy Court properly considered this to be a "damaging admission", 15 B.R. at 762.[5]

In contrast, while formally denying the validity of its debt to Chase, B.D.I. "did not offer a scintilla of substantive proof to rebut the Chase claim", 15 B.R. at 762.[6] On the basis of the evidence presented by Chase and the absence of any contrary evidence, Bankruptcy Judge Lifland concluded that "Chase clearly established a 'substantial basis' for its claim", 15 B.R. at 762, and therefore included the claim in his determination whether B.D.I. was generally not paying its debts under 11 U.S.C. § 303(h)(1). Final adjudication of the validity of the Chase claim was postponed and is to be resolved in a subsequent trial. 15 B.R. at 764 n. 26.

■ The Bankruptcy Court then went on to conclude that B.D.I. was generally not paying its debts as they became due, basing its conclusion on what it described as the "totality of the record before the Court." 15 B.R. at 764.[7] The principal factors that led to this conclusion were: *first,* that B.D.I. had ceased its business operations entirely and had placed all of its assets in a lawyer's escrow account; *second,* that the past due debt to Chase comprised an exceedingly large share of the debtor's assets; and, *third,* that the Bankruptcy Court considered there were "special circumstances" that made the administration of this case in the bankruptcy court "appropriate." Among these special circumstances were the transfer of $4.3 million out of the country to Segrex, the subsequent $710,000 loan to Segrex, and the creation of B.D.I.'s successor entity, B.D. Discount of America. 15 B.R. at 764. Accordingly it granted relief under § 303(h).

The debtor appealed to the district court which affirmed substantially on the opinion

---

5. We see no merit in B.D.I.'s claim that the court could not properly take account of this since it was "[e]vidence of conduct or statements made in compromise negotiations." F.R.E. 408. The rule "does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations". Furthermore Rule 408 is limited to cases of "compromising or attempting to compromise a claim which was disputed as to either validity or amount." At the time of negotiation B.D.I. did not dispute Chase's claim; it was simply endeavoring to get more time in which to pay. *See* 2 Weinstein's Evidence ¶ 408[01] at 408–410 (1981).

6. Counsel for B.D.I. stated that determination of the dispute in regard to Chase's claim "will needlessly duplicate proceedings that are already underway in the State Court, and that, I might add, have been vigorously litigated on both sides" and that among the issues being litigated in the state court were "complicated issues of negligence that will necessarily require a jury trial." (J.A. 54a–55a). Counsel did not offer any part of the state court record in evidence. Counsel has cited no authority for the proposition that a bank's negligence in overcrediting a customer is a defense to the bank's claim for an amount which the customer must have known to have been credited in error.

7. We see no reason why, as B.D.I. contends, evidence taken at the dismissal hearing could not be considered as supplementing that taken at the trial.

of the Bankruptcy Judge. It then appealed to this court.

The provisions of § 303(h) were an innovative provision of the Bankruptcy Code, replacing the acts of bankruptcy required for involuntary bankruptcy by § 3a(1)–(6) of the Act of 1898. Unhappily the language "the debtor is generally not paying such debtor's debts as such debts become due" is woefully lacking in clarity.

The legislative history sheds a limited amount of light. Putting aside the portion of the history relating to what is now § 303(h)(2), the story runs as follows: The bill recommended by the Commission on the Bankruptcy Laws of the United States, 93d Cong., 1st Sess., House Document No. 93–137, Part II, p. 74, provided in § 4–205(c):

Relief may be directed on a creditor's petition

(1) if the debtor will be generally unable to pay his current liabilities as they become due;

(2) if the debtor has generally failed to pay his debts as they become due . . .

An accompanying note explained, *id.* at 75:

5. *Subdivision* (c) generally substitutes the equity test of insolvency for an act of bankruptcy as the ground for involuntary relief. The existence or nonexistence of this ground should be more easily determined than an act of bankruptcy, as defined in § 3a(1)–(6) of the present Act, and insolvency as defined in § 1(19) of the present Act, as of the time of the act or the petition if the first act is relied on. The scope and meaning of "generally unable" and "generally failed" are left to the courts; it is not possible to lay down guidelines that will fit all cases. However, it is clear that the court must find more than prospective inability to pay

only a few of the debtor's liabilities when they fall due and more than a past failure to pay only a few of his debts. It is intended that the court consider both number and amount in determining whether the inability or failure is general.

Neither the House nor the Senate bill as reported by the respective Judiciary Committees adopted the language recommended by the Commission. Under § 303(h) of the House bill, 95th Cong., 1st Sess., H.R. 8200, the sole test was whether "the debtor is generally unable to pay such debtor's debts as such debts become due." The accompanying report, 95th Cong., 1st Sess., H.R.Rep. No. 95–595, p. 323, U.S.Code Cong. & Admin.News 1978, p. 5787, 6280, after summarizing the statute, said simply:

The equity insolvency test has been in equity jurisprudence for hundreds of years, and though it is new in the bankruptcy context (except in chapter X), the bankruptcy courts should have no difficulty in applying it.[8]

The Senate bill, 95th Cong. 1st Sess., S. 2266, was considerably more favorable to the grant of relief where a single large creditor or only a few such creditors sought bankruptcy. Its version of § 303(h)(1), authorized such relief, p. 322, if "the debtor is generally unable to pay *or has failed to pay a major portion of his debts as such debts become due.*" (Emphasis supplied.) Under the italicized language, a creditor like Chase whose claim constituted some 98% of the total debt would clearly prevail since it would meet the second branch of the test whether it met the first or not. The accompanying report, 95th Cong., 2d Sess., S.Rep. No. 95–989, p. 34, was silent on this difference between the bill reported by the Sen-

---

**8.** This ignored that the equity insolvency test said nothing about "generally", see Collier, Bankruptcy, 14th ed. ¶ 1.19, p. 99 n. 10—the word that creates all the trouble. Even in the situation where there would seem to be the least objection to an involuntary "single creditor" bankruptcy, namely, when the debtor is a corporation and there is no prospect of rehabilitation under Chapter 11, Congress might have thought that such a proceeding would serve neither of the two major purposes of bankrupt-

cy—achieving equality among creditors and giving the debtor a fresh start, *Burlingham v. Crouse,* 228 U.S. 459, 473, 33 S.Ct. 564, 568, 57 L.Ed. 920 (1913); *Roslyn Savings Bank v. Comcoach,* 698 F.2d 571, 573 (2 Cir., 1983). Although appointment of a trustee would make available to the single creditor some remedies not available under state law, Congress could have considered that the resources of the bankruptcy system should not be devoted to such cases.

ate Judiciary Committee and that which had been reported by its counterpart in the House. It contented itself with the same reassuring words contained in the House report. There was no conference committee report, but Representative Edwards, who had been a member of the Bankruptcy Commission and sponsor of the House bill, said, on the floor of the House, 124 Cong. Rec. H 11091 (Sept. 28, 1978):

> Section 303(h)(1) in the House amendment is a compromise of standards found in H.R. 8200 as passed by the House and the Senate amendment pertaining to the standards that must be met in order to obtain an order for relief in an involuntary case under title 11. The language specifies that the court will order such relief only if the debtor is generally not paying debtor's debts as they become due.

The "compromise" was the substitution of "is generally not paying" for "is generally unable to pay"; the Senate's alternative test, failure to pay a major portion of the debts, disappeared.

The history thus clearly points to insistence by Congress on generality of default. Plainly also, as said in 2 Collier, Bankruptcy (15th ed. 1982), ¶ 303.12 at 303–50:

> The application of this test by the courts is proving to be somewhat difficult despite the comforting words of the legislative history to section 303(h)(1).

The many cases cited in this section of the Collier treatise emphasize that if Congress thought it had provided a test that would lead to quick and sure determinations, it was badly misadvised and should consider returning to the drawing board.

█ We do not think this is the case in which we should attempt to lay down a definitive rule. Here, the bankruptcy judge was justified in finding that B.D.I. was generally not paying its debts as they became due on any reasonable interpretation of that language. It was not paying Chase; it was not paying Citibank; it had not paid

Willkie Farr;[9] it had not paid the City of New York for several years. We do not agree with B.D.I. that the evidence was defective because Citibank's attorney was not sure of the precise amount of its claim or because Willkie Farr[10] and the City were not called to give testimony. B.D.I. conceded the indebtedness to Willkie Farr, and the City's proof of claim was sufficient in the absence of any contention that the amount was not owed. Under the peculiar circumstances of this case, this evidence seems sufficient to meet the test of generality.

█ B.D.I. contends that even if these conclusions are correct, which it of course denies, a disputed claim, such as that of Chase, cannot be considered a debt the debtor is not paying since Congress could not have intended to allow a creditor to force a debtor into bankruptcy because the debtor exercised its right to have a court pass on the validity of a claim. Chase responds that the statutory text requires disputed claims to be treated on a parity with undisputed ones. The argument runs as follows: Section 101(11) defines "debt" as "liability on a claim" and § 101(4) defines "claim" as "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, *disputed*, undisputed, legal, equitable, secured, or unsecured" (emphasis supplied). Chase finds further support for its position in the fact that the only claims specifically ruled out by § 303(b)(1) are contingent claims; the bankruptcy judge correctly held that Chase's claim did not fall into that category. Still we have difficulty in believing that Congress intended that a debtor should be found to be generally not paying its debts as they become due under § 303(h)(1) or that a claim qualifies under § 303(b), when the claim is subject to serious dispute. As said in *In re Nar-Jor Enterprises Corp.*, 6 B.R. 584, 586 (Bkrtcy.S.D.Fla.1980), the bankruptcy courts were "not designed or

9. We assume that the critical date is that of the petition rather than of the trial, although the statute is ambiguous on this point.

10. The record affords no basis for determining whether the payor of Willkie Farr is subrogated to its claim.

intended to be the forum for trying isolated disputed claims." But here, after having been afforded the opportunity, B.D.I. failed to demonstrate to the bankruptcy court what ground it had for disputing Chase's claim. In order to qualify a claim as a basis for seeking involuntary bankruptcy, a claimant need not make out a case warranting summary judgment although in fact Chase came close to this.[11] It is sufficient to establish, as Chase did here, that there are good grounds for the claim and that no defenses have been asserted in substantiable form. Whether less may suffice we need not decide.

Both parties have discussed at length what appears to be the only appellate decision on the treatment of disputed claims for the purpose here in question, *Matter of Covey,* 650 F.2d 877 (7 Cir.1981). In *Covey* the late Judge Sprecher developed an intricate balancing formula, designed to afford a rule of decision in all cases, with respect to the inclusion of disputed debts in the "generally not paying debts" determination. Apart from the question whether the treacherously simple statutory language will support so elaborate a gloss, we think it a bit early in the day to essay a "guideline" opinion on this subject. As Justice Harlan said, dissenting in *Sanders v. United States,* 373 U.S. 1, 32, 83 S.Ct. 1068, 1085, 10 L.Ed.2d 148 (1963), such opinions "suffer the danger of pitfalls that usually go with judging in a vacuum. However carefully written, they are apt in their application to carry unintended consequences which once accomplished are not always easy to repair." We prefer to see some more cases before we decide whether to accept *Covey,* either as written or in a modified form, as the law of this circuit, although our decision here is consistent with it.

We realize that, by deciding both phases of this case upon the particular facts here presented, we are not giving bankruptcy judges the guidance which they doubtless desire and it is our duty to provide if we properly can. But it is better to fail in this respect than to attempt to give guidance without having seen the variety of factual situations, having heard the adversary presentations, and having the benefit of scholarly commentary which time will undoubtedly afford.[12] Drawing the lines under § 303(h), both as to generality and also as to the status of disputed claims, will be assisted "by the gradual approach and contact of decisions on the opposing sides." *Noble State Bank v. Haskell,* 219 U.S. 104, 112, 31 S.Ct. 186, 188, 55 L.Ed. 112 (1911) (Holmes, J.); *see also Davidson v. New Orleans,* 96 U.S. 97, 104, 24 L.Ed. 616 (1877). It suffices to decide this case that the bankruptcy judge was warranted in finding that B.D.I. was failing to pay not merely Chase but all other creditors and thus was generally not paying its debts as they became due, and that Chase was not disqualified as a petitioning creditor under § 303(b) or as the holder of debt that was not being paid by B.D.I. by virtue of a purported dispute which B.D.I. did not sufficiently support.

Affirmed.

---

11. It is settled that a litigant faced with a sufficiently supported motion for summary judgment cannot simply sit back and say "I have a good answer to all this but I won't disclose it now." See, e.g., *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1967) (party cannot rest on mere denial in complaint in opposition to properly supported summary judgment motion); *Markowitz v. Republic Nat'l Bank of N.Y.,* 651 F.2d 825, 827 (2 Cir. 1981) (opposing party may not rest on mere conclusory allegations); *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2 Cir.1978) (par-

ty opposing summary judgment must set forth concrete objections); *Dressler v. The M.V. Sandpiper,* 331 F.2d 130, 133 (2 Cir.1964) (same). *See also* F.R.Civ.P. 56(e) (adverse party may not rest on mere denial of his pleading when summary judgment motion is made).

12. We add, although without too much hope in light of the many pressing problems with which it is faced, the possibility that, having beheld the disarray in the bankruptcy courts, Congress will clarify just what it desired with respect to generality in making this important change in the test for involuntary bankruptcy.