**In re Lee CORDOVA and Rose Cordova, Debtor.**

**In re LEE CORDOVA CHEVROLET, INC., Debtor.**

**Bankruptcy Nos. 7–83–00068 R A Involuntary, 7–83–00069 R A Involuntary.**

United States Bankruptcy Court, D. New Mexico.

Oct. 26, 1983.

Douglas T. Francis, Francis & Arland, P.A., Albuquerque, N.M., for debtors.

Michael Wile, Keleher & McLeod, P.A., Albuquerque, N.M., for petitioning creditor.

## MEMORANDUM OPINION

STEWART ROSE, Bankruptcy Judge.

This is a one creditor, involuntary petition for Chapter 7 relief. The petitioning creditor, First National Bank of Santa Rosa, holds as collateral substantially all of the pledgeable assets of the Cordovas and of Lee Cordova Chevrolet, Inc. The parties agreed that, combined, there are less than twelve creditors, and consented to the two petitions being heard together and treated as one.

The issue here is whether failure to pay the debt owed to the creditor is generally not paying debts as they become due, when other credit is not extended, but the alleged debtor continues to operate by paying its suppliers cash.

Lee and Rose Cordova bought the Chevrolet dealership in Santa Rosa, New Mexico, in 1972. Santa Rosa was, and is, a small town on Route 66. The town was bypassed by I–40, also in 1972, and the many businesses which had depended on revenues from highway traffic suffered a sharp decline. The dealership suffered with them, and in 1976 turned to First National for a $130,000 loan, which refinanced debt, allowed improvements, and provided operating capital. The Cordovas themselves also borrowed, eventually owing the Bank in excess of $150,000.

Business in general failed to rebound, and the Cordovas fell behind on their notes.

The Bank realized the dealership was in trouble, but held off accelerating the notes. Instead, the notes were treated as what the Bank's Vice-President termed "evergreen" notes, that is, notes which would not be deemed to be in default, but would be refinanced as necessary. In truth, the Bank was carrying the Cordovas: it did not press for payments; it covered NSF checks; it paid for insurance on its collateral. These actions seem to have been based, at least in part, on a desire to avoid the economic turbulance which would have resulted from the dealership's closing.

In March, 1982, the Bank re-negotiated its loan to the dealership. Two notes were executed: one for $119,275.30 at 6% interest; the other, covering interest due, for $12,552.14 at 0% interest. The interest figures are indicative of the Bank's reluctance to force the Cordovas out of business. The first payment, $1,013.85, was due in May, 1982. No payment was received, and none have since been tendered. On January 19, 1983, after considering its position, the Bank filed the involuntary petitions.

In order for this Court to provide the requested relief, the Bank must show the requirements of 11 U.S.C. § 303 have been met; specifically, §§ 303(b)(2) and 303(h)(1).

The evidence is clear that while the Bank is secured to a great extent, it is unsecured in excess of $5,000. Since there are fewer than 12 creditors, § 303(b)(2) is satisfied.

Section 303(h)(1) requires that:

> ... the Court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed, only if—
>
> (1) the debtor is generally not paying such debtor's debts as such debts become due ...

This is the equity insolvency test, and represents a compromise between the Senate and House versions of the bankruptcy bill. 124 Cong.Rec. H11,091 (Sept. 28, 1978); S17,407 (Oct. 6, 1978). It was apparently intended to give courts a certain amount of discretion. Congress felt, since the test had been in existence for years,

"... the bankruptcy courts should have no difficulty in applying it", H.R. No. 95–595, 95th Cong. 1st Sess. 324 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6280. Courts of bankruptcy, however, have found the language "... woefully lacking in clarity." *B.D. International Discount Corporation v. Chase Manhattan Bank, N.V. (In re B.D. International Discount Corporation)* 8 C.B.C. 300, 304, 701 F.2d 1071 (2nd Cir., 1983).

■ It would appear that a car dealer with an on-going business, having only one creditor, must be paying his debts as they become due. "The general rule appears to be that if a debtor is not paying a single debt, then the case should be dismissed since a creditor cannot prove the debtor is generally not paying its debts as they become due." 2 Collier on Bankruptcy, ¶ 404.-07[1][b] (15th Ed., 1983). Moreover, use of the Bankruptcy Court is not favored, because a Bankruptcy Court is not "... a substitute for customary collection procedures", *In re S.B.A. Factors of Miami, Inc.,* 13 B.R. 99, 100 (1981).

Still, there is the occasional necessity for one-creditor bankruptcies. The leading case is *In re Seven H Land and Cattle Co.,* 2 C.B.C.2d 554, 6 B.R. 29 (Bkrtcy.1980). Ruling on a motion for summary judgment by the alleged debtor based on there being only one creditor, the Court acknowledged the general rule, but denied the motion. Lacking any U.S. guidance, the Court analyzed "generally not paying" in light of a similar provision in Canadian Bankruptcy law, and concluded that relief could be ordered in one creditor cases where either the single creditor is without an adequate remedy in non-bankruptcy law, or there has been some fraud or trickery which allows the debtor to pay his other creditors.

What is "generally not paying" in multiple creditor cases is not entirely useful in single creditor cases. The oft-cited rule of *In re All-Media Properties, Inc.,* 2 C.B.C.2d 449, 5 B.R. 126 (Bkrtcy.1980) is that generally not paying includes missing a significant number of payments to creditors, and

that where the creditors are few, the significant number not being paid will be lower. However, when the number drops to one, distinctions between debt collection proceedings and bankruptcy proceedings break down.

Bankruptcy exists to meet society's need for something other than straight debt collection. "The special goals of Bankruptcy Policy are often expressed as threefold: (1) equality of distribution among creditors, (2) a fresh start for debtors, and (3) economical administration." Report of the Commission on the Bankruptcy Laws of the United States, H.R.Doc. No. 93–137, 93rd Cong., 1st Sess., Pt. I (1973) at 75.

Here, with no evidence of any other debts, equality of distribution is not a concern. Nor, would it seem, is the debtor's fresh start, since they are actively opposing its imposition.

The third principal, as well as other considerations, remains. The major asset of the CORDOVAS is the dealership. The dealership includes property (e.g., the franchise) which either cannot be executed upon, or is not collateral. A piece-meal sale of collateral, as would result from a state court proceeding, will not satisfy the debt. The dealership loses much of its value if the franchise is not transferred. Selling an on-going business would bring a much better return, but the County Sheriff is not equipped to deal in autos until a buyer can be found.

With this in mind, it becomes clear that the petition is the result of a plan calculated to achieve maximization of the Bank's debt collection. The last thing the Bank wants is a courthouse steps liquidation. Bankruptcy can prevent this. A trustee, or a debtor-in-possession, is in a position to operate the business until it can be sold, and all of the assets, including the franchise, can be dealt with.

The Bankruptcy Court is particularly well constituted to supervise an efficient and economically reasonable administration of the estate. The Bankruptcy Court can minimize undesirable repercussions, and maximize creditor recovery. The State Court

cannot, state law remedies are inadequate here. Further, if any additional claims are brought forward, the Bankruptcy Court can handle them fairly.

Granting the petition will permit an orderly and rational solution to what is now the Cordovas overwhelming and unmanageable debt. Finding that non-bankruptcy means do not exist to adequately deal with the debt, and that the Bankruptcy Court is in the best position to administer the estate, the requested relief will be granted. An appropriate Order will issue.