**In re Ralph SPIGENER d/b/a Southland Timber Company and A.W. Baker.**

**Bankruptcy Nos. 585–01162–S, 585–01161–S.**

United States Bankruptcy Court, W.D. Louisiana, Shreveport Division.

Jan. 6, 1986.

---

Randy Elkins, Minden, La., for alleged debtors, Ralph Spigener and A.W. Baker.

William Paul Lawrence, II, Scott J. Crichton, Comegys, Lawrence & Jones, Shreveport, La., for plaintiffs-petitioning creditors.

## INTRODUCTION

LeROY SMALLENBERGER, Bankruptcy Judge.

On July 8, 1985 various alleged creditors of Ralph Spigener and A.W. Baker filed this "Petition for Involuntary Bankruptcy". In their Petition, these creditors alleged that they are holders of matured promissory notes, currently due, co-signed by the alleged debtors. The original petitioning creditors are as follows:

| NAME | AMOUNT |
| --- | --- |
| Vickie Bailey and Bobby Simpson | $ 79,000 |
| Jerry Brown | 48,000 |
| Marsha Burnham | 152,000 |
| Eva Johnson | 15,000 |
| Julius Peterson | 337,000 |
| Dena Slaid and Bobby Simpson | 40,000 |
| Maxey White | 550,000 |
| Paul Williams | 45,000 |
| Randy Williams | 30,000 |
| TOTAL: | $1,296,000 |

On October 9, 1985 additional promissory note creditors intervened:

| NAME | AMOUNT |
| --- | --- |
| Bobby Barnette | $ 42,000 |
| Delores Barnette | 30,000 |
| Roger Barnette | 60,000 |
| Johnathan Black | 47,000 |
| Roger Black | 13,000 |
| James W. Green | 32,000 |
| Jimmy Hollan | 97,000 |
| Rev. B.K. Miller | 160,000 |
| Laura Pugh | 12,000 |
| James N. Zey | 40,000 |
| | $ 533,000 |

Thus, the alleged debtors, prime movers in the often called "North Louisiana Timber Scam", were placed before this Court for a determination as to whether they

should be adjudged bankrupt as provided by the Bankruptcy Code.

A short history will help provide the framework for this case. In May 1980, Maxwell Green and M.F. Copeland had been active in the timber business for some time. One of the people these gentlemen solicited as an investor was Ralph Spigener, then President of Claiborne Bank and Trust Company. Mr. Green assured all investors that through his connections with major timber companies he could buy and sell bulk timber. Thus, as a "broker", Mr. Green put up approximately 10% as option money paid to the landowner; when Mr. Green found a purchaser he would buy the timber from the landowner and sell it to a third party at a profit. All investors were assured that they would never lose their principal investment, but only their potential profit—in effect the investors were funding the option. None of these timber deeds or options were ever recorded, supposedly to preclude attracting too much attention to such a good investment. Based on his sales pitch, Mr. Spigener and others made initial investments to Mr. Green; no promissory notes were issued at that early stage. Mr. Spigener contacted Mr. Baker, a retired Coca-Cola Company employee, and Mr. Baker borrowed money and invested it in Mr. Green's and Mr. Copeland's enterprise. The profit system was designed so that the more money invested the greater each investor's profit—more investment meant more profit. Mr. Copeland did the traveling and calculating concerning the monetary aspect of the business. Mr. Green handled the timber side of the business and Mr. Spigener began soliciting for other investors from their friends and acquaintances. These investors were paid an annual interest rate on the money invested and were to have received a share in the profits from the sale of the timber. It is these investors who are the petitioning creditors before this Court.

By December of 1982, the total investment exceeded a million and a half dollars. The timber enterprise was going so well that Mr. Spigener resigned as President of the Bank. By May of 1983, Mr. Spigener and Mr. Copeland had a falling out and Mr. Spigener took Mr. Copeland's place as the bookkeeper of the business. At this juncture, Mr. Spigener conceived the idea of making the business a more "formal" one. Thus, a name was conceived, Southland Timber Company, but never incorporated under Louisiana Law. Additionally, Mr. Spigener began issuing promissory notes. The record indicates that the investors had lost faith in Mr. Copeland and without Mr. Spigener and his new method of issuing promissory notes would no longer have invested in the enterprise. Unknown to everyone, including Mr. Spigener, even though Mr. Green publicly agreed to remove Mr. Copeland from the enterprise, Mr. Copeland remained a close associate of Mr. Green's in his end of the enterprise.

The investments continued until April of 1985; at that time almost 5 million dollars had been invested in the enterprise. On April 10, 1985, Mr. Green committed suicide and the whole enterprise collapsed; there were no timber deeds and no money. Some of the checks issued by Mr. Green to the investors were returned for insufficient funds; the amount totaled over one-half million dollars.

In addition to this bankruptcy proceeding, various other actions have been initiated in State Court by investors and some lending banks. This involuntary proceeding was tried on September 26, 1985. The matter was taken under advisement and memorandums of law were requested. For the sake of brevity, the two cases were consolidated for purposes of this Court's opinion.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### 1. Standing of the Creditors

In this case, section 303(b)(1) and section 303(h)(1) are of primary importance, they provide:

(b) An involuntary case against a person is commenced by the filing with the

bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject on [sic] a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts that are the subject of a bona fide dispute;

In the 1984 amendments to section 303,[1] Congress attempted to settle the raging controversy concerning whether to include claims or creditors whose claims were subject to a "bona fide dispute". Congress has, by the 1984 amendments, expressly excluded these claims. Congress apparently has rejected the complicated procedure exposed in *In Re Covey*, 650 F.2d 877 (7th Cir.1981) in favor of the more balanced approach of *In Re B.D. International Discount Corp.*, 701 F.2d 1071 (2nd Cir.1983) and *In Re All Media Properties Inc.*, 646 F.2d 193 (5th Cir.1981). Disputed debts and creditors with disputed claims are to be excluded:

where a debtor fails to pay a debt which is subject to a bona fide dispute, that debt should not be considered a debt which has not been paid as it became due. There is no apparent reason why a debtor should have to pay disputed debts to avoid the entry of an order of relief. *In Re All Media Properties* 5 B.R. 126,

144 (Bkrtcy.S.D.Tex.1980) aff'd, 646 F.2d 193 (5th Cir.1981).

This reflects a policy to preclude creditors from dragging debtor's into the stigma of an involuntary bankruptcy, when in fact the claim is subject to a valid, legitimate dispute. Bankruptcy is not to be used as a threat to pay a disputed claim. Further, this Court was not designed to be a forum for trying isolated claims.

In concert with this policy, the 1984 amendments made significant revisions concerning disputed claims. First, the test for the standing of petitioning creditors was revised to provide that holders of claims subject to a bona fide dispute are precluded from being petitioning creditors. Second, a debt which is the subject of a bona fide dispute is precluded from the "generally not paying debts when due" test of section 303(h). *In Re Johnston Hawks Ltd.*, 49 B.R. 823 (Bkrtcy.D. Hawaii 1985).

We note that there are practical problems with this rationale. Under the bona fide dispute rule creditors are forced to proceed to another forum, likely State Court, to determine the validity of their claim. In the interim, personal assets of the debtor could easily be liquidated or sent to some island haven. This Court, however, is not the only legal remedy available to the creditors and it appears clear that Congress wanted creditors to proceed elsewhere to settle disputed claims.

■ A definition of bona fide dispute was not incorporated into the Code by the 1984 amendments. There are courts which have provided their own definition:

a bona fide dispute is a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side. *In Re Johnston Hawks Ltd.*, supra at 830.

In addition, the nature of the dispute and the extent of the evidence presented in support of the creditor's claim and the

**1.** Bankruptcy Amendments and Federal Judge- ship Act of 1984. Public Law 98–353.

debtor's contrary claim have also been deemed important. One Court has used the standard applicable on motions for summary judgments. *In Re Stroop,* 51 B.R. 210 (D.C.Col.1985). The best approach is a combination of these two schemes combining an analysis of competing policy interest in bankruptcy with a motion for summary judgment analysis; indeed, this formula appears to have been done in two cases, *B.D. International Discount Corp.,* supra and *In Re Cinnamon Lake Corp.,* 48 B.R. 70 (Bkrtcy.M.D.Fla. 1985). *In Cinnamon,* Chief Judge Paskay summarized the cases as follows:

> In balancing these interests, courts have considered, inter alia, the following circumstances:
>
> (1) The nature and status of the dispute; *In Re B.D. International Discount Corp.,* 701 F.2d at 1077; *In Re R.N. Salem,* 29 BR [424] at 430 (1983).
> (2) Does the dispute go merely to the amount of the claim or the entire claim. *In Re Covey,* 650 F.2d at 883.
> (3) Has the debtor ceased its business operation. *In Re Covey,* 650 F.2d at 884.
> (4) Do the disputed claims comprise an exceedingly large share of the debtor's assets. *B.D. International Discount Corp.,* 701 F.2d at 1074.
> (5) Do the disputed claims comprise an exceedingly large percentage of its business debts. *In Re Covey,* 650 F.2d at 884.
> (6) Does the creditor hold a security interest in property of the debtor. *In Re R.N. Salem Corp.,* 29 BR at 431. 48 B.R. at 73.

Using the analysis of these recent cases, the Court concludes that the petitioning creditors have established the absence of a bona fide dispute with respect to these claims against the alleged debtor.

Granted, these disputes concern a complicated timber scam involving the alleged debtors who solicited for investors and signed promissory notes as security for their investment. Further, it is unclear in which cases, if any, were the notes equal to the amount invested; indeed, many of the claimants may well have been paid off and the promissory notes not been marked paid. Further, some of the promissory notes were paid but were either reissued or used to secure additional investments. In this case, however, the debtors have argued that these promissory notes are subject to a bona fide dispute. This assertion is based primarily upon the argument that there was not proper consideration for the obligation incurred by the promissory note. We disagree. The alleged debtors repeatedly asserted that they never received any monies from these investors; Mr. Spigener, as a bank president, was designated as the record keeper for the business. The promissory notes were signed in blank by Green, Baker and Spigener and Mr. Spigener would fill the note in when the option matured. Thus, the debtors argue that these promissory notes were "merely" a record keeping device so that the investors would have some record of the monies that they had transferred to Southland Timber Company. The Court rejects this argument.

An analysis of the dealings of the alleged debtors, and the other parties indicates a sophisticated, knowledgeable group of businessmen who were well aware of the effect of the signing of these promissory notes.

Mr. Spigener testified:

Q. All right. And were you serving as the president of that bank when you first began your involvement in this timber investment business?

A. Yes, I was.

Q. Sir, as a bank president, you know what a promissory note is, I take it?

A. Yes, I do.

Q. All right. And you know that when you sign your name to a promissory note you are obligating yourself to pay a sum of money to the payee on that note?

A. That's correct.

Q. All right. So, you don't dispute that by signing these promissory notes you contracted an indebtedness to these investors, do you not?

A. I don't dispute that at all, but what I do say along with that is the fact that because Maxwell Green received those funds and it was very clearly understood that Maxwell Green would been responsible for paying these funds back.

Q. But you also would be responsible, is that not true?

A. Legally and technically, I realized when I signed my name to it that I would also be responsible. (Tr. at pg. 79)

The Court has no doubt that the motivation behind ·this transaction was profit. The alleged debtors shared in the profits realized from the use of the funds; indeed, the alleged debtors were well aware that the greater the investment, the greater the profit.

It is reasonable to conclude that the debtors were well aware of the impact that the use of their good name and credit would be. These debtors are prominent men in their respective communities. Investors were solicited at social and church functions, in post offices and restaurants. These gentlemen did such a good sales job that people were convinced that there was no possibility of financial loss.

Finally, the alleged debtors have argued that the promissory notes were issued "merely" as a record keeping system designed to ensure that investors were paid correctly. The Court agrees that the promissory notes are a handy record keeping device. We believe, however, that the evidence indicates that the promissory notes were a security device issued by the alleged debtors and Green as security for the indebtedness owed to the individual investor by the debtors.

Accordingly, the Court concludes that the petitioning creditors have established the absence of a bona fide dispute with respect to their claims against the debtors and thus have standing to bring this involuntary bankruptcy proceeding.

2. · Have the debtors generally not been paying their debts as they became due?

Once the Court has determined that the petitioning creditors have proper standing, the Court must determine whether the debtors have generally not been paying their debts as they became due. 11 U.S.C. 303. *In Re Johnston Hawks, Ltd.,* supra. The "generally not paying" standard of section 303(h)(1) is not defined in the Bankruptcy Code; it is clear, however, that this Court must find more than a prospective inability to pay. 2 Collier on Bankruptcy ¶ 303.1 (15th ed. 1984). Rather, the Court should examine the amount, tardiness of payments, the length of time during which the debtor has been unable to meet his debts, the debtors overall handling of its affairs, whether the debtor is handling his financial affairs in good faith and the existence of serious allegations concerning irregularities in the conduct of the debtors' business. 2 Colliers on Bankruptcy ¶ 303.-12 (15th ed. 1984).

■ Initially, we note that demand for payment is not made necessary by the Code. *In Re All Media Properties, Inc.,* 5 B.R. 126, 2 C.B.C.2d 449 (Bkrtcy.S.D.Tex. 1980). The Court, in *All Media,* found that when a debt is overdue for more than 30 days, it establishes that the debt has not been paid as due. Under Louisiana law, performance of an obligation not subject to a term is due immediately. LSA C.C. 1777, 1778 (West 1985). Neither Spiegner nor Baker have sufficient assets to pay the timber investors their money pursuant to the promissory notes. At the time this petition was filed, neither gentleman was working. They have no other sources of income. The evidence further indicates shifting of assets to cover expenses and borrowing money from relatives to cover daily living expenses. .

In addition to having obligations due to the named petitioners, both debtors have current outstanding mortgages on their homesteads. Mr. Spigener has made no payments on his homestead mortgage of $200,000,· since April 1985. Mr. Baker owes Homer National Bank over $48,000 secured by a mortgage on his home; no payments have been made on that mortgage or to debts owed to First National

**40**

Bank of Arcadia or American Bank and Trust Company of Shreveport.

Thus, this Court concludes that both debtors are not generally paying their debts as they come due. Neither Mr. Baker or Mr. Spigener have the present financial ability to meet any of the claims of the timber investors. Further, an examination of the financial status of both debtors indicates that the vast majority of the obligations are not being paid as they become due.

Accordingly, it is ordered that the relief requested by the petitioning creditors is granted and that A.W. Baker and Ralph Spigener be ordered placed in involuntary bankruptcy under section 303 of the Bankruptcy Code.