**In re HOPE COMMUNICATIONS, INC.**

**Bankruptcy No. 586–00569–M.**

United States Bankruptcy Court,
W.D. Louisiana,
Monroe Division.

April 25, 1986.

Chet Harrod, Blackwell, Chambliss, Hobbs & Henry, West Monroe, La., for Hope Communications, Inc., involuntary debtor.

Charles R. Blaylock, Monroe, La., for petitioning creditors.

## FINDINGS OF FACT

LeROY SMALLENBERGER, Bankruptcy Judge.

On February 27, 1986, various alleged creditors of Hope Communications filed this "Petition for Involuntary Bankruptcy." In their petition these creditors allege that they are holders of claims against the alleged debtor arising from their employment as commissioned salespersons of the debtor. The creditors also filed a motion to appoint an interim trustee under section 303(g) of the Bankruptcy Code. This motion was abandoned on March 18, 1986. The original petitioning creditors are as follows:

(a) MIKE DOWNHOUR, has a claim for earned and vested commissions due him from sales of advertising contracts for the debtor which were due and payable January 15, 1986 in the amount of Seven Thousand Seven

Hundred and Twenty-Five and No/100 ($7,725.00) Dollars.

(b) DON ZIMMERMAN, has a claim for earned and vested commissions due him from sales of advertising contracts for the debtor which were due and payable June 19, 1985 in the amount of Four Thousand Nine Hundred and No/100 ($4,900.00) Dollars.

(c) CARLA MILLER, has a claim for earned and vested commissions due her from sales of advertising contracts for the debtor which were due and payable June 19, 1985 in the amount of Three Thousand Eight Hundred Fifty and No/100 ($3,850.00) Dollars.

(d) KIRK FISHER, has a claim for earned and vested commissions due him from sales of advertising contracts for the debtor which were due and payable June 20, 1985 in the amount of Three Thousand Seven Hundred and No/100 ($3,700.00) Dollars.

(e) MICAH LINDSEY, has a claim for earned and vested commissions due him from sales of advertising contracts for the debtor which were due and payable August 6, 1985 in the amount of Eight Hundred Seventy-Five and No/100 ($875.00) Dollars.

On March 7, 1986, the alleged debtors filed a "Motion for Indemnity Bond". These matters came on for hearing on April 2, 1986. At that hearing, this Court took under advisement and requested briefs on the issue of whether or not the plaintiff's claims were subject to a bona fide dispute. By agreement of counsel, this matter was submitted to the Court by affidavit and depositions. All other issues were continued pending this Court's determination of the standing of the petitioning creditors and the nature of the claim that the creditors have against the alleged debtor.

Hope Communications owns KNAN, the radio station which employed the petitioning creditors.

First, the Court notes the procedural background of the litigation between the petitioning creditors and the alleged debtor. On February 25, 1986, all five former employees filed suit in the Fourth Judicial District Court in the Parish of Ouachita, Louisiana. The petitioning creditors in both the State Court suit and the petition before this Court alleged that they are entitled to a commission on monies collected by the debtor after they were no longer employed by the debtor. The debtor argues that no money is owed under the terms of the employment contract between the parties before this Court.

Each of the petitioning creditors was initially provided a salary upon employment. This usually lasted for two months. After that, they were paid by receiving a commission of 19% of collections of the advertising contract, as provided by the employment contract. For example, Mr. Downhour was employed as a salesman for KNAN. His job was to solicit and sell radio advertisements accounts and then maintain and service the account and keep in contact with the particular customer, then make sure that the correct commercial was advertised on the radio. When Mr. Downhour was terminated at the end of January 1986, the total amount of accounts receivable at that time was approximately $37,000.00, thus he is claiming a percentage of those outstanding advertising contracts. Currently, Mr. Downhour is working for KNOE, a Monroe radio station competitor of KNAN. The record shows that none of the alleged creditors have proof or any other indication that the accounts receivable owed after they were terminated have in fact been paid.

Mr. Fisher, who is another of the petitioning creditors, worked for KNAN approximately four months and was terminated from his job on June 14, 1985. Mr. Fisher's salary was calculated as provided in the employment contract. During the four months that Mr. Fisher worked for KNAN, he earned approximately $3,000.00 and claims he is owed another $3,700.00 for sales made during the four month period.

Mr. Lindsey was employed by KNAN from June 10, 1985, to July 31, 1985.

Again, like the two previous alleged creditors, he was paid on a commission basis of 19 percent over and above his initial monthly draw of $650.00. At the end of his employment, Mr. Lindsey was paid $625.00 and apparently owed KNAN $25.00 because his commissions did not exceed his base guarantee. However, Mr. Lindsey claims that he is owed approximately $875.00 for sales during the two month period. Again, Mr. Lindsey was unable to show just exactly how much was collected on the accounts after he was terminated.

Ms. Miller worked for KNAN for one year and eight months as an account executive. Her compensation was based on a $600.00 draw and a 20% commission on collected sales accounts above that draw. In contrast, Ms. Miller resigned from her position in July of 1985. Ms. Miller stated that she immediately began looking for a new job when she realized that the employment contract provided that she would not be paid on accounts that she had sold if the collections were after her termination. Again, Ms. Miller has no way of knowing the exact amount of money that was collected on the accounts after her termination.

All of the creditors decided that they needed to put the alleged debtor in involuntary bankruptcy because they had heard that 1) the debtor was getting ready to sell the radio station and, 2) that they were counseled that an involuntary bankruptcy is an expedient means to collect the money that was allegedly owed to them.

Mr. Zimmerman worked for KNAN from July 1984 to June 13, 1985. Again, Mr. Zimmerman resigned from his position when he had a new job at another radio station in Monroe, Louisiana. Originally, Mr. Zimmerman was employed in the production, writing and producing of commercials for KNAN, at which time he was paid $1,500.00 a month. He began working part-time in the sales section and was paid the 19% commission. He worked part-time as a salesperson and then switched full-time to sales. He was paid, as a full-time salesperson, $1,500.00 a month or the 19%

commission, whichever was greater. Mr. Zimmerman stated that he decided to switch jobs when he realized the effect of the employment contract on his ability to collect his commission on sales that were paid for after his termination date. Again, Mr. Zimmerman does not know exactly what accounts were paid after his termination date.

It is clear to the Court that this case involves an emotional and heated group of claims against the alleged debtor. It is also apparent that the stigma of a bankruptcy may have been an important factor in the filing of the bankruptcy in this close knit radio community with competing salespeople for the different radio stations trying to generate sales.

Finally, we quote in pertinent part the employment contract signed by all of the petitioning creditors:

4.  COMPENSATION

A.  KNAN pays 19% commissions on collections;

i.  we do not pay for sales; we only pay for collections.

B.  All KNAN Salespeople are responsible for their own collections.

i.  the station does the billing.

ii.  the salesperson is responsible for personal pick-up of checks and for seeing that no account runs more than 60 days behind.

iii.  our goal is for all accounts to pay by the 10th of the following month. Salespeople are to inform their accounts of this.

C.  PAYMENT ON COLLECTIONS IS MADE ON THE 15th OF THE MONTH AFTER THE COLLECTION IS MADE.

i.  all accounts that pay during April are commissionable the 15th of the following month; so you'd get all of your April commissions on May 15th; all your May commissions on June 15th. This has nothing to do with your sales for that month: remember, you're being paid on collections, not sales.

ii. you can draw against your paycheck of the 15th on the first; it must be an amount approved in advance, and basically unchanging.

D. At the beginning of your tenure with KNAN and periodically after that, some running accounts will be turned over to handle.

i. if this account was a house account or came from a list that belonged to a salesperson who is no longer here, you will begin collecting commissions immediately (under the system outlined in point C. above.)

ii. if this account belonged to a salesperson who is still employed here, you will begin collecting commissions as soon as all commissions due the previous salesperson are paid.

E. At the end of your tenure with KNAN, you will be paid the commissions due through your final month of employment here.

i. example: if you leave, voluntarily or otherwise, before May 1, you'll get a final check of all commissions due from April's collections ... (in accordance with point C. above.)

ii. example: if you leave, voluntarily or otherwise, on May 10, you'll get commissions due from April's collections; plus all commissions due from collections between May 1 and May 10.

iii. *you are NOT ENTITLED to any commissions collected AFTER your termination.* (Court Emphasis).

F. What about contracts sold for future months; in the event of termination of employment with KNAN?

i. you drew commissions on things you did not sell at the beginning of your tenure; you may not draw commissions on advertising still to be paid for ... including advertising that has already run (if not paid by your last day of employment) and including advertising ordered but not yet run. Again, commissions are not paid on sales ... or on spots run. Commissions are paid only on COLLECTIONS

... and only on collections that are made by your last day of employment with KNAN.

## CONCLUSIONS OF LAW

Recently this Court addressed the standard to be applied in involuntary cases under the 1984 amendments. We wrote:

In this case, section 303(b)(1) and section 303(h)(1) are of primary importance, they provide:

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject on [sic] a bona fide dispute, or an indenture trustee representing such a holder, if such claims aggregate at least $5,000 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(h) If the petition is not timely controverted, the court shall order relief against the debtor in an involuntary case under the chapter under which the petition was filed. Otherwise, after trial, the court shall order relief against the debtor in an involuntary case under the chapter which the petition was filed, only if—

(1) the debtor is generally not paying such debtor's debts as such debts become due unless such debts that are the subject of a bona fide dispute;

In the 1984 amendments to section 303,[1] Congress attempted to settle the raging controversy concerning whether to include claims or creditors whose claims were subject to a "bona fide dispute". Congress has, by the 1984 amendments, expressly excluded these claims. Congress apparently has rejected the complicated procedure exposed in *In Re Covey*, 650 F.2d 877 (7th Cir.1981) in favor of the more balanced approach of *In Re B.D. International Dis-*

---

1. Bankruptcy Amendments and Federal Judge-

ship Act of 1984. Public Law 98–353.

count Corp., 701 F.2d 1071 (2nd Cir.1982) and *In Re AllMedia Properties Inc.*, 646 F.2d 193 (5th Cir.1981). Disputed debts and creditors with disputed claims are to be excluded:

> where a debtor fails to pay a debt which is subject to a bona fide dispute, that debt should not be considered a debt which has not been paid as it became due. There is no apparent reason why a debtor should have to pay disputed debts to avoid the entry of an order of relief. *In Re All Media Properties* 5 B.R. 126, 144 (Bkrtcy.S.D.Tex.1980) aff'd, 646 F.2d 1983 (5th Cir.1983).

This reflects a policy to preclude creditors from dragging debtors into the stigma of an involuntary bankruptcy, when in fact the claim is subject to a valid, legitimate dispute. Bankruptcy is not to be used as a threat to pay a disputed claim. Further, this Court was not designed to be a forum for trying isolated claims.

In concert with this policy, the 1984 amendments made significant revisions concerning disputed claims. First, the test for the standing of petitioning creditors was revised to provide that holders of claims subject to a bona fide dispute are precluded from being petitioning creditors. Second, a debt which is the subject of a bona fide dispute is precluded from the "generally not paying debts when due" test of section 303(h). *In Re Johnston Hawks Ltd.*, 49 B.R. 823 (Bkrtcy.D.Hawaii 1985).

We note that there are practical problems with this rationale. Under the bona fide dispute rule creditors are forced to proceed to another forum, likely State Court, to determine the validity of their claim. In the interim, personal assets of the debtor could easily be liquidated or sent to some island haven. This Court, however, is not the only legal remedy available to the creditors and it appears clear that Congress wanted creditors to proceed elsewhere to settle disputed claims.

A definition of bona fide dispute was not incorporated into the Code by the 1984 amendments. There are courts which have provided their own definition:

a bona fide dispute is a conflict in which an assertion of a claim or right made in good faith and without fraud or deceit on one side is met by contrary claims or allegations made in good faith and without fraud or deceit on the other side. *In Re Johnston Hawks Ltd.*, supra at 830.

In addition, the nature of the dispute and the extent of the evidence presented in support of the creditor's claim and the debtor's contrary claim have also been deemed important. One Court has used the standard applicable on motions for summary judgments. *In Re Stroop*, 51 B.R. 210 (Bkrtcy.D.C.Col.1985). The best approach is a combination of these two schemes combining an analysis of competing policy interest in bankruptcy with a motion for summary judgment analysis; indeed, this formula appears to have been done in two cases, *B.D. International Discount Corp.*, supra and *In Re Cinnamon Lake Corp.* 48 B.R. 70 (Bkrtcy.M.D.Fla. 1985). *In Cinnamon*, Chief Judge Paskay summarized the cases as follows:

In balancing these interests, courts have considered, inter alia, the following circumstances:

(1) The nature and status of the dispute; *In Re B.D. International Discount Corp.*, 701 F.2d at 1077; *In Re R.N. Salem*, 29 BR [424] at 430.

(2) Does the dispute go merely to the amount of the claim or the entire claim. *In Re Covey*, 650 F.2d at 883.

(3) Has the debtor ceased its business operation. *In Re Covey*, 650 F.2d at 884.

(4) Do the disputed claims comprise an exceedingly large share of the debtor's assets. *B.D. International Discount Corp.*, 701 F.2d at 1074.

(5) Do the disputed claims comprise an exceedingly large percentage of its business debts. *In Re Covey*, 650 F.2d at 884.

(6) Does the creditor hold a security interest in property of the debtor. *In Re R.N. Salem Corp.*, 29 BR at 431.

*In Re Ralph Spigener and A.W. Baker*, 59 B.R. 35 (1/6/86). Using the analysis of these recent cases, the Court concludes

that the petitioning creditors have not established the absence of a bona fide dispute with respect to these claims against the alleged debtor.

These disputes concern a complicated employment action involving the alleged debtor. The nature and status of these disputes concerning the validity of the employment contract are not the type of matter that this Court believes Congress intended to be settled in Bankruptcy Court. This dispute goes to the entire claim, not to an amount. Further, this debtor appears fiscally sound and continues in business, well respected in the community. True, the management of its employees may have been substandard, or even abusive, but that issue is *not* a matter for this Court. Additionally, this dispute concerns a very very small share of the debtor's debts. Settlement of this issue would in no way hamper the ability of this business to operate but the continuance of the debtor in a Chapter 11 proceeding does serious harm to the debtor's reputation in the communications community. Lastly, none of these creditors holds a security interest in the debtor. All creditors are former employees of the debtor. Apparently, no attempt was made to engage or solicit additional business creditors, and the Court believes that the reason for this is apparent—the debtor is paying his debts as they come due.

The Court believes that it must conclude that the petition was improvidently filed, these claims being the subject of a bona fide dispute as that phrase is interpreted under the bankruptcy case law. Thus, judgment will be entered denying the requested relief. The Court notes that the alleged debtor has requested damages and attorneys fees in concert with this filing. The Court, at the present time, will not deny this request. The alleged debtor may request a hearing on such relief at which time the Court will determine if attorney fees and damages can be or should be granted.