In re RAMM INDUSTRIES, INC.

Bankruptcy No. 87–2239–BKC–6P7.

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

March 8, 1988.

**816**

Donald E. Christopher, Orlando, Fla., for debtor.

Raymond Rotella, Orlando, Fla., for petitioning creditors.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

GEORGE L. PROCTOR, Bankruptcy Judge.

THIS CASE is before the court on the involuntary petition of three creditors, William J. Herisko, John Frank Etchberger, and Lawrence Solodky, and the subsequent joinder by Randall A. Mingo, Barry Barfield, Kenneth Mann, and Transcore, Inc. The case first came before the Court for hearing on November 25, 1987 on a motion to dismiss and to require filing of indemnity bond by Debtor. At that hearing, the Court deferred ruling on the motion to dismiss and denied the motion to require the filing of an indemnity bond. The case was set for trial commencing on December 7, 1987. The Court's crowded docket necessitated trying the case in several sessions, so that the trial finally concluded on February 2, 1988. After careful consideration of the evidence offered by the parties at trial, the Court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1. The Debtor, Ramm Industries, Inc., is a Delaware corporation whose principal place of business is within the Middle District of Florida. The Debtor was organized during 1987 as a holding company for several other operating corporations. These include Ramm Electronics, Inc., Ramm Vending Promotions, Inc., and Ramm Food Products, Inc. All of these corporations have a common pair of shareholders—Dr. Howard B. Brown, and Charles Arnold (hereinafter referred to as "Brown and Arnold"). The corporations are separate legal entities but have shared common offices and employees. The Debtor, Ramm Industries, Inc., has never actively engaged in business, although the Ramm Industries' name is utilized by several of the other Ramm companies in their operations. The Debtor has few creditors. The Debtor's subsidiaries, however, have a number of creditors. The Debtor's accountants prepared consolidated statements for the various affiliated Ramm companies. References to the Debtor will therefore include its subsidiary corporations, except where expressly noted.

2. The shareholders of the Debtor, Brown and Arnold, began their business over six years ago by forming Ramm Electronics, Inc. That corporation originally engaged in the business of establishing and servicing video tape rental locations throughout the country. The business eventually evolved over time so that during 1987 the Debtor's principal line of activity was the sale and servicing of pizza distributorships, under the name of Papa Primo's Pizza. Ramm Electronics, Inc. originally leased offices in the Southland Business Park in Orlando, Florida. A representative of the management company which handled that leasehold space testified that the rent was always timely paid during the course of the original lease and one renewal. As its business grew, Ramm expanded beyond the amount of space it had originally leased. This included both office and warehouse space. During late September, 1987, after the filing of the petition in this case, the Debtor moved into new offices owned and developed by Brown and Arnold. The Debtor leases approximately half of this building back from Brown and

Arnold. During the summer and fall of 1987, the Debtor paid over $200,000.00 for leasehold improvements to the new building.

3. Brown and Arnold have managed the Debtor's business since the beginning although they make many trips outside of Orlando. These trips sometimes last as much as a month. Notwithstanding his frequent absences from the office, Brown has remained the only signatory on the various corporate checking accounts. In order to deal with the awkward arrangement, the Debtor has engaged in the practice of having Brown sign checks for payment of Ramm's bills before he embarks. Employees at the Debtor's office hold these checks and do not transmit them to Debtor's vendors until Brown gives telephonic authorization. This practice results in Debtor's check ledgers often showing substantial overdrafts, even though the bank accounts themselves are not overdrawn. The Debtor's certified public accountants testified that this method of handling payables by advance check writing and delayed mailing is utilized by many small or closely held businesses. The fact that the Debtor's checkbooks may show overdrafts, is therefore not proof of financial distress.

4. Brown and Arnold are apparently unpopular with certain employees. Of the seven petitioning creditors, three are former employees of the Debtor. Two others are attorneys retained by the Debtor and two are full time consultants who have worked for the Debtor. Aside from the petitioning creditors, no other creditor testified at trial that it had not been satisfactorily paid by the Debtor in a timely manner.

5. In the fall of 1986, Brown and Arnold met petitioning creditor William Herisko in a financial conference in Zurich, Switzerland. As a result of these discussions, Herisko began work for the Ramm companies in November, 1986 as Chairman and Chief Executive Officer. Herisko was employed by the Debtor under an arrangement pursuant to which a corporation he controlled, Transcore, Inc., contracted with Debtor for Herisko's services. A formal memorandum of agreement dated November 1, 1986, was executed by the parties on January 19, 1987. Creditors offered into evidence a copy of the agreement which contained an addendum that was written by Herisko, but was not signed by either Brown or Arnold. The addendum provided for the payment of Herisko's personal moving expenses from California to Florida. The handwritten addendum was excluded from evidence by the Court. Both Brown and Arnold testified that they never agreed to pay Herisko's moving expenses, and in fact refused to do so. Herisko testified to the contrary.

6. As a result of their dissatisfaction with Herisko's failure to successfully bring to fruition the projects he had undertaken at Ramm, Brown and Arnold assigned Morris Turkleson to take over as Chief Operating Officer in late July or early August of 1987. Herisko tendered his resignation on August 27, 1987. Before tendering his resignation, Herisko demanded payment of $29,126.65, which he contended was due Transcore, Inc., consisting of $11,134.71 in moving expenses incurred by Herisko, $11,615.62 in unpaid commissions, and $6,376.32 in business and travel expenses. Herisko told Turkleson that if his demand for payment was not honored he would file an involuntary bankruptcy petition against the Debtor. In response, Turkleson prepared a memo, which was read to Herisko on September 1, 1987, informing him that Debtor disputed payment, but that if Herisko was able to prevail on his claims in any legal action, that Ramm had more than adequate funds available to satisfy such claims. In fact, at that time, the various Ramm bank accounts had available over $50,000.00.

7. In June, 1987, Herisko was trying to interest Brown and Arnold to invest in a company called Super Energy Homes, Inc. A check for $20,000.00 was drafted for this purpose, signed by Brown, and entrusted to the bookkeeper, Greg Templeton, to hold until Brown authorized disbursement of it. While Brown and Arnold were out of town on a sales trip, Herisko secured this check from Templeton. Brown and Arnold both testified that when confronted with the

matter in the summer of 1987, Herisko on behalf of himself and Transcore, Inc. agreed to reimburse Debtor the $20,000.00. Herisko denies this statement. Brown and Arnold claim Debtor is entitled to withhold any commissions payable to Herisko or Transcore under the November 1, 1986 memorandum agreement, until the $20,-000.00 has been repaid.

8. Andrew Baron, counsel for Herisko, prepared the bankruptcy petition and solicited attorney, Lawrence Solodky, to sign as a petitioning creditor. Solodky signed the petition without carefully reading it. Solodky had no knowledge as to the number of Debtor's creditors or whether any of them were not being paid as their debts became due. Solodky testified in a portion of his deposition that he viewed "the petition as a way to collect [his] bill with the minimum of effort," and that the bankruptcy petition "would either put enough leverage on the Debtor or actually go through with the Chapter 7" so that his "outstanding bill would be paid at some point in time without [him] having to bother chasing or collecting". Solodky was owed a total of $446.25. That sum was originally billed to Ramm Electronics, Inc. on July 20, 1987. Solodky's only previous bill to Ramm Electronics had been sent on June 1, 1986, totaling $321.00, and that bill was paid ten days later on July 11, 1987. According to Arnold, the July 20, 1987 bill had not come to his attention or that of Brown as of the date of filing the petition, which was a month and half later. Subsequent to filing of the petition, but before trial, Solodky's bill was paid in full with interest.

9. One of the matters on which Solodky was representing Ramm Electronics, Inc. was a pending suit by attorney, Kenneth L. Mann. Mann sued Ramm Electronics, Inc. and Brown in June, 1987 for approximately $6,000.00 in unpaid attorneys' fees. At the time of filing the petition, Solodky was still the attorney of record for Ramm Electronics, Inc. and Brown in the Mann lawsuit. Mann's law firm subsequently joined as a petitioning creditor on December 3, 1987. The Debtor continued to defend against Mann's litigation in state court. The state court has set that action for trial during February, 1988.

The nature of the dispute over Mann's bill involves work he did for a separate venture, Parc Entertainment, Inc., owned by Pat Armstrong. Armstrong originally retained Mann and Mann did most of his work for Armstrong. The Debtor became involved with Armstrong in marketing Parc Entertainment. Because of Armstrong's limited resources, Debtor paid Mann $5,000.00 and signed an agreement to pay additional fees in conjunction with a securities offering of Parc. Although Brown signed the fee agreement, and Arnold was aware of Mann's involvement with Parc Entertainment, neither maintained any significant involvement in the project. They relied upon Herisko to monitor it. Herisko, in turn, told them that they should not pay the statements they received from Mann for attorneys' fees because Mann's charges were excessive. The fees were not paid. Mann filed suit against Brown individually in an attempt to collect the approximately $6,000.00 he claimed was due his law firm.

10. Also working as a consultant in connection with the Parc project was petitioning creditor John Frank Etchberger. Etchberger's company, Trizak Financial Corporation, entered into a contract with Ramm Electronics, Inc., on December 16, 1986 providing for a $3,000.00 per month base retainer, payable semi-monthly for financial consulting services. At the beginning of June, 1986 Ramm became dissatisfied with the progress being made by Etchberger and terminated his contract. On June 2, 1987 Etchberger was given a check for Trizak which included a $1,500.00 advance for the first half of June. Arnold testified that during his conversations with Herisko and Etchberger, Etchberger agreed to accept this check, which included the $1,500.00, as the final payment terminating his contract. The written contract provided for termination upon 30 days notice.

Trizak Financial Corporation subsequently provided an invoice to Herisko dated July 20, 1987. The invoice requested payment of $1,500.00, which is shown to be the balance due for Trizak's services after the

date of contract termination, June 1, 1987. Arnold and Brown refused to pay the invoice because of their belief that Etchberger had agreed to accept Debtor's check tendered back at the first of June as Trizak's final payment. On the eve of the filing of the petition, Etchberger sent a new statement addressed to Brown as President of Ramm Industries, Inc., dated September 2, 1987. The September 2, 1987 statement demanded payment of $10,500.00, including $3,000.00 for the month of September, 1987, on the basis that, contrary to Trizak's earlier July 20th invoice, the contract had never been terminated and the additional $1,500.00 for the period June 15 through June 30 had not been paid. The letter further recited that Trizak had assigned its contract to Etchberger personally, and demanded payment.

Neither the fact of this assignment nor the sum demanded by Etchberger are set forth in the petition and schedules. At trial, Etchberger testified Trizak never received written notice of cancellation under the contract, despite the apparent acknowledgement in his July 20, 1987 invoice that the contract had in fact been terminated, effective June 1, 1987.

11. Once Morris Turkleson learned of the petition filing, he began to search for Ramm's business records regarding transactions with the petitioning creditors. A number of records were missing. Barry Barfield, who had been employed by Debtor for a number of years, first as a secretary and later as office manager, was suspected by Turkleson, Brown, and Arnold as being in concert with Herisko. Barfield was ordered to take a week's vacation. Upon her return, she was terminated by Turkleson and offered two checks, one in the gross amount of $1,000.00 and the other in the gross amount of paid $500.00 representing Barfield's salary payable to that date, plus two weeks severance pay. Barfield refused to sign a statement agreeing not to contact suppliers, distributors, and creditors in return for tender of the checks. Barfield had no further communications with the Debtor until she filed her request with this Court to become a petitioning creditor on December 2, 1987. She testified to being owed $2,000.00 for four weeks unpaid vacation and $300.00 for wages for three days.

12. Randall A. Mingo is also a petitioning creditor. He seeks payment of $612.75 for commissions due from the Debtor. Mingo was fired by Ramm on November 4, 1987, at which time he made a request for payment of such commissions. On November 14, 1987, he was $500.00. The Debtor lacked definitive records regarding whether Mingo was entitled to any commissions. Arnold stated the $500.00 was paid as a good faith gesture in an attempt to compromise the Debtor's dispute with Mingo.

13. Several of the petitioning creditors testified that a number of trade creditors, including Moran Printers and several suppliers of frozen pizzas, were not being paid as their bills generally became due. The testimony from representatives of these other creditors contradict these charges. For example, James Kuhn, the owner of Pizza Kitchens in Jefferson, Wisconsin testified in his deposition that Ramm Food Products averaged purchases of approximately $25,000.00 per month during 1987. The time for payment on these purchases by Ramm Foods had averaged between 15 to 30 days. On one large volume order, totalling approximately $65,000.00, it took Debtor 38 days to pay. Kuhn expressed no dissatisfaction with the Debtor's payment practices.

Nor did Harold Hershey, the owner of Papa's Pizza in Bradenton, Florida. Hershey acknowledged that he had become embroiled in a dispute with Ramm over the first shipment of pizza he had provided to them in December, 1986. Hershey testified that Ramm's refusal to pay his company was legitimate, based on the fact that the initial shipment provided by Pappa's Pizza was defective. Since the dispute was resolved in May, 1987, Ramm has paid Papa's Pizza satisfactorily. Pappa's Pizza's monthly volume of business, according to the witness, averages approximately $14,000.00, making Ramm its largest customer. Although Hershey had asked for immediate payment by Ramm of some of his company's invoices, he had done so not as

result of Debtor's failure to pay in accordance with Papa's Pizza's terms, but rather because the volume of Ramm's business placed strains on the cash flow of Hershey's growing young business.

The credit manager of Moran Printing Company testified to six figure sales to Ramm for nearly a year prior to the petition. Ramm had maintained a satisfactory credit account with Moran. The Debtor offered testimony of additional trade creditors, including its insurance agent, travel agent, and carpet supplier on the new building. Each of these trade creditors indicated satisfactory payment by Ramm of their invoices, the amount of which often greatly exceeded on a one month basis the total amounts claimed by the petitioning creditors.

14. Herbert J. Smith, who had purchased a pizza distributorship from the Debtor in Maryland testified he is dissatisfied with the success of his distributorship, but acknowledged that the Debtor provided him all requested products. On cross-examination he disclosed that a previous credit balance in his favor had been eliminated so that he owed Ramm money. A few weeks before testifying he had paid that money making the transactions about "even".

15. The day the original petition was filed, Herisko ran into Al Eyster as Herisko was leaving the Orlando International Airport to depart for Texas. Eyster was traveling from Texas to Orlando and had recently purchased from Ramm a pizza distributorship for the Houston area. Recognizing Herisko, Eyster queried him as to why Herisko was not staying in Orlando for a financial conference that Eyster was to attend in connection with his Ramm distributorship. During that conversation and a subsequent telephone call the next day, Herisko disclosed to Eyster the pendency of the bankruptcy petition, and represented to Eyster that Debtor was in dire financial straits, and would soon be in the hands of a trustee. Among other things, Herisko told Eyster that Ramm had half a million dollars pending against it in lawsuits by distributors. But when pressed by Eyster, Herisko replied that none of these suits had any validity and that all were typical claims from disgruntled customers. Eyster testified in his deposition that he timely received all the pizzas and ovens due him in accordance with his contract.

16. Neither the Debtor nor any of its affiliates has ever had a judgment rendered against it. At the date of filing, the Debtor had no unsatisfied judgment creditors.

17. One of the duties Herisko undertook while he was at the Debtor was to oversee the companies' financial affairs and to secure the preparation of appropriate financial statements. Up through the middle of 1986, the firm of Moss, Glickstein, Laval, Heitler & Roth had provided accounting services. The Debtor ceased utilizing that firm after its CPA with whom Howard Brown had been dealing for nearly 15 years was overcome by an illness and subsequently died.

18. Ramm Electronics has a $300,000.00 line of credit at Southeast Bank which was due for renewal in the summer of 1987 and therefore required the financial statements Herisko was charged with preparing. Upon learning of Herisko's departure and the pending bankruptcy petition, Southeast Bank requested that the Debtor secure an outside CPA firm to prepare financial statements for the bank to review in connection with such renewal. Debtor retained the Orlando accounting firm of Osburn, Henning & Company to prepare an interim financial statement as of August 31, 1987. Ramm also hired Judy Cregger, a certified public accountant, as a full time employee to organize the financial affairs.

19. Osburn, Henning prepared an income statement and balance sheet covering the operations of Ramm Electronics, Inc. and its affiliates for the first eight months of 1987. Although Osburn, Henning prepared the statement as a compilation, Judy Cregger testified that she personally organized the records and undertook many of the bookkeeping functions necessary in order to prepare a general ledger for Ramm for 1987, so that, in her opinion as a CPA, the resulting financial statement is actually

more reliable than if Osburn, Henning & Company had been retained to prepare an audited statement. The financial statement introduced in evidence reveals that during the first eight months of 1987 the Debtor earned income of $56,998.00 before taxes, on gross sales of $3,242,885.00. Accounts payable as of August 31, 1987, totalled $211,514.00.

20. Although the Debtor was slow in making payments on the accounts in the summer of 1987, improvement did occur in the fall. Every creditor, other than those whose claims were disputed, was paid in 30 days or less. In fact, in response to the filing of the bankruptcy petition, many of the creditors changed terms to require cash on delivery or payment in advance, conditions which the Debtor was able to meet. All the accountants who testified stated that the Debtor's operations were strong and opined that the Debtor's affiliates were generally paying their obligations as they became due.

21. According to Judy Cregger, the petitioning creditors' claims in the aggregate represent little more than one percent of the bills actually owed or paid to other creditors by the Debtor. Disregarding those amounts claimed by the petitioning creditors which have been disputed by the Debtor, the remainder represent less than a tenth of a percent of the obligations incurred and paid by the Debtor's subsidiaries and affiliates in 1987, before filing of the petition.

22. In looking at the bank statements of the Ramm companies, the accountants testified that the few bank overdrafts in those accounts were all due to bank errors or disorganization within the Debtor's staff, prior to the hiring of Judy Cregger. None of the overdrafts resulted from any financial pressure. The Debtor regularly maintained substantial bank balances consistent with the level of its operations.

Before Cregger's employment, the Debtor had no general ledger. A personal computer was available for use in logging the accounts payable. None of Ramm's employees, however, knew how to successfully utilize the program. The reports generated were inaccurate and unreliable. Former bookkeeper Greg Templeton testified that he had maintained a general ledger on computer through the time of his departure from Ramm in June, 1987, but his testimony was contradicted by the present employees of Ramm. The petitioning creditors offered no documentary evidence to support Templeton.

CPA Debbie Alezracki of Osburn, Henning & Company found nothing at Ramm's office to indicate that a general ledger had been kept or maintained during 1987. When she analyzed the figures which appeared on Herisko's financial statements for the periods ending December 31, 1986 and March 31, 1987, she found those figures to be grossly inaccurate and unsupported by any other work papers or records she found at the Debtor.

Debbie Alezracki testified that she had witnessed a dramatic turnabout in the record keeping practices, organization, and reliability of the financial reporting function at Ramm after Cregger was hired.

23. The petitioning creditors introduced an aged accounts payable report showing outstanding bills on or about the date of filing the petition. Although it discloses nearly half of Ramm's unpaid bills at that time to be more than 30 days old, some of the items are the subject of a bona fide dispute. A good deal of the remaining unpaid items over 30 days have been explained by creditors such as Moran Printing, who said it was their normal practice to extend their account for longer than 30 days and that they regularly allowed and accepted payments by Debtor more than 30 days after invoice. The petitioning creditors did not introduce any direct evidence from other creditors, aside from the accounts payable aging reports produced by the Debtor, which would indicate that Ramm was not paying its creditors in accordance with terms otherwise agreed upon and acceptable to the creditors.

24. Several of the petitioning creditors who were formerly employed at Ramm, along with former bookkeeper Templeton, claim that Ramm has a practice of reaching its credit limit with a particular supplier

and then switching vendors rather than paying that supplier. The term Randall Mingo applied to this practice was "maxing out." This assertion was generally not substantiated. To the contrary, Ramm has done business with a number of its suppliers for over a year or more prior to the date of filing and continued to do so up through the time of trial. The established course of conduct between the Debtor and its creditors did allow for payment in some instances longer than 30 days after invoice date.

## CONCLUSIONS OF LAW

1. In order to file an involuntary petition, 11 U.S.C. § 303, three or more entities, each of which holds a claim against the Debtor that is not contingent as to liability or the subject of a bona fide dispute, must join as petitioning creditors and the three claims together must aggregate at least $5,000.00. Additional persons may join as a petitioning creditor after the filing of a petition but before the case is dismissed. 11 U.S.C. § 303(c).

2. Although the Court proceeded to hold a trial in accordance with the provisions of § 303(h) of the Bankruptcy Code, and has taken evidence on the question of whether the Debtor "is generally not paying [its] debts as such debts become due unless such debts are the subject of a bona fide dispute", the Court took under advisement the Debtor's Motion to Dismiss. The Court must now consider the merits of the Motion to Dismiss before deciding the issue of whether the Debtor has generally not been paying its debts as they become due.

3. Of the three original petitioning creditors, the Debtor concedes that Lawrence Solodky had a valid claim for $446.25. In fact, the Debtor had paid Solodky this sum plus interest before the case came on for trial. No argument was made that Solodky was not otherwise entitled to be a petitioning creditor, except for the fact that his claim was contingent because it is against Ramm Electronics, Inc. rather than the Debtor, Ramm Industries, Inc. As to the remaining two original petitioning creditors, William Herisko and John Etchberger,

however, the Debtor has consistently alleged that their claims are subject to a bona fide dispute and that the assignment of their claims was not properly disclosed in the petition.

4. Under the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub.L. No. 98–353, 98 Stat. 333, 369 (1984) (BAFJA) Congress provided that creditors holding claims which are in "bona fide dispute" cannot be petitioning creditors and that debts subject to a bona fide dispute may not be considered by the Court in determining whether a debtor is not generally paying its debts as they become due. Having received little guidance from the legislative history as to how to determine whether "a bona fide dispute" exists as to a particular debt, the courts have reached differing results in developing a test for use in applying the statutory language. This Court agrees with the standard formulated by the District Court for the Northern District of Indiana in *Matter of Busick*, 65 B.R. 630, 637–38 (N.D.Ind.1986), which was subsequently affirmed and adopted by the Seventh Circuit Court of Appeals in *Matter of Busick*, 831 F.2d 745, 749–50 (7th Cir.1987). That approach does not require the Court to determine the outcome of any dispute, only its presence or absence. Thus, the Court need only engage in a limited analysis of the claims at issue in order to determine whether there exists a genuine issue of material fact that bears upon the debtor's liability, or a meritous contention as to the application of law to undisputed facts. 65 Bankr. 637. As the District Court emphasized in *Busick*, the term "bona fide" as it appears in § 303 "refers only to a dispute, not the moral character of those involved in it." 65 Bankr. 638.

5. Applying this standard to the claim of petitioning creditor Herisko, the Court concludes that his claim is the subject of a bona fide dispute. A genuine issue of material fact exists as to whether Debtor agreed to pay Herisko's personal moving expenses. With regard to the reimbursements for travel expenses sought by Herisko, factual issues exist as well

regarding whether those expenses were incurred during the course of his work for the Debtor or whether they were incurred by him in conducting personal business or business for entities unrelated to the Debtor. Similarly, Herisko's claim for payment of $11,615.62 in commissions while he worked for the Debtor, which claim was subsequently asserted by Herisko's corporation, Transcore, Inc., in its pleading to join as a petitioning creditor dated December 18, 1987, is the subject of a bona fide dispute. The Debtor denies Herisko is entitled to receive commission payments. Debtor claims that even if the commissions were payable they should be off-set against the $20,000.00 discussed earlier in connection with the Super Energy Homes housing investment. The testimony shows different positions. The Court need not resolve this dispute but must only find that it does in fact exist. *In re: Nar-jor Enterprises Corp.*, 6 B.R. 584, 586 (Bankr.S.D.Fla. 1980). Because a real disagreement obviously exists, the Court concludes that the claims of petitioning creditors Herisko and Transcore, Inc. are the subject of a bona fide dispute and therefore these claims may not be considered.

6. Considering next the claim of petitioning creditor Etchberger, the court concludes that it is also the subject of a bona fide dispute. At trial, Etchberger took the position that the Debtor owes him, as assignee of Trizak Financial Corporation, the sum of $1,500.00 plus $3,000.00 per month for every month thereafter until paid. Arnold testified that Etchberger agreed to accept a check on June 2, 1987 as final payment under his contract. That check included $1,500.00 for the first half of June, during which time Etchberger had ceased providing services to the Debtor. The subsequent invoice of Trizak Financial Corporation, dated July 20, 1987, provides support for both sides. On the one hand, Etchberger's corporation appears to acknowledge in this invoice that its consulting agreement with Ramm Electronics, Inc. was terminated on June 1, 1987. On the other hand, however, the invoice lends some support to Etchberger's claim that Trizak was owed an additional $1,500.00 for the remainder of June. The dispute over this matter existed before the filing of the bankruptcy petition. Resolution of the dispute involves real questions of both law and fact.

7. The claim of petitioning creditor Mann is also the subject of a bona fide dispute. For a number of months prior to the filing of the petition, Mann and the Debtor were engaged in litigation over the claim in state court. A trial has been scheduled. The testimony regarding Mann's claim raises material factual issues regarding the propriety of the claim. He cannot be a petitioning creditor.

8. The claim of petitioning creditor Barry Barfield for $2,000.00 for four weeks' unpaid vacation and $300.00 for three days' work fares no better than the claims just considered. The Court heard conflicting testimony from a number of witnesses regarding the vacation policy at the Debtor. Neither side produced any written records to support their position. Even assuming the amount of vacation to which Barry Barfield was entitled was not at issue, a substantial dispute remains as to whether she had already used the vacation to which she was entitled or whether, as she testified, she had taken no vacation during 1987. A separate legal issue exists concerning the circumstances of Barfield's termination, during which Turkleson tendered certain checks to her which she refused to accept because the tender was conditioned upon her executing an agreement not to contact Ramm's suppliers and customers. She is therefore not entitled to be a petitioning creditor under § 303(b) of the Bankruptcy Code and her debt must be eliminated from any calculation under § 303(h) as to whether the Debtor generally is not paying its debts as they become due.

9. Even though the evidence is less clear as to the claim of Randall Mingo, the Court nevertheless concludes that it is the subject of a bona fide dispute which disqualifies Mingo from being a petitioning creditor. When Mingo was terminated on November 4, 1987, the testimony supports Mingo's claim that he was entitled to receive some unpaid commissions from the

Debtor. On November 14, 1987, the Debtor in fact paid Mingo the sum of $500.00. Brown and Arnold testified this was a final payment in compromise of Mingo's claim. Mingo denies this assertion and swears he is entitled to be paid an additional $612.75. On this record, the Court must conclude that Mingo's claim is the subject of a bona fide dispute.

10. In considering the claims of Herisko, Barfield and Mingo, the Court further takes note that all these claims are virtually identical in origin. These creditors are aggrieved former employees of the Debtor. Their claims are similar to those advanced by the petitioning creditors in the case of *In re: Hope Communications, Inc.*, 59 B.R. 939 (Bankr.W.D.La.1986). In concluding that the petitioning creditor's claims in that case were all subject of a bona fide dispute, the bankruptcy court observed:

These disputes concern a complicated employment action involving the alleged debtor. The nature and status of these disputes concerning the validity of the employment contract are not the type of matter that this Court believes Congress intended to be settled in Bankruptcy Court. This dispute goes to the entire claim, not to an amount. Further, this debtor appears fiscally sound and continues in business, well respected in the community. True, the management of its employees may have been substandard, or even abusive, but. that issue is *not* a matter for this Court. Additionally, this dispute concerns a very, very small share of the debtor's debts. Settlement of this issue would in no way hamper the ability of this business to operate but the continuance of the debtor in a Chapter 11 proceeding does serious harm to the debtor's reputation in the communications community. Lastly, none of these creditors holds a security interest in the debtor. All creditors are former employees of the debtor. Apparently, no attempt was made to engage or solicit additional business creditors, and the Court believes that the reason for this is apparent—the debtor is paying his debts as they come due.

59 B.R. at 944. As it appears was the case before the court in *Hope*, the petitioning creditors in the proceeding at bar spent a great deal of time during trial presenting testimony in an attempt to portray the Debtor's owners, Brown and Arnold, as abusive tyrants who consistently dealt with their employees in bad faith. Even if true, bankruptcy courts are ill-equipped to handle such labor disputes on a routine basis. These matters should be left to the non bankruptcy forum.

11. The only petitioning creditor not disqualified by the BAFJA amendments to § 303(b)(1) of the Bankruptcy Code because of the existence of a bona fide dispute is Lawrence Solodky. Three petitioning creditors do not therefore exist whose claims aggregate $5,000.00 against the Debtor. The Debtor's motion to dismiss will be granted.

12. Having fully tried the case, the Court is in a position to nevertheless consider the question of whether the Debtor is generally not paying its debts as they become due in accordance with the standards set forth under subsection 303(h). When considering this question in another case, this Court found that in order to make the determination of whether a Debtor is generally not paying its debts as they become due, it must:

[C]ompare the number of debts unpaid each month to those paid, the amount of the delinquency, the materiality of the non-payment, and the nature of the Debtor's conduct of its financial affairs.

*In re: The Leek Corporation*, 52 B.R. 311, 314 (Bankr.M.D.Fla.1985) (citations omitted). When considering all these factors in the proceeding now at bar, the Court must conclude that the Debtor, Ramm Industries, Inc., and its affiliates have generally been paying their debts as they become due, except those which are subject to a bona fide dispute, because:

(a) The amount of those debts unpaid each month is less that twenty percent (20%) of those invoices which have been paid.

(b) The amount of those debts which were allowed to become delinquent is modest in comparison to the volume of the

Debtor's overall business and to the cash balances which the Debtor actually maintained in its bank accounts.

(c) In most instances the reasons for non-payment of invoices in the past, aside from those involving disputed claims, arose as a result of an absence of proper internal financial controls and management. In the time between the filing of the petition and the trial of this action, the Debtor appears to have instituted internal financial controls and systems commensurate with the growth and size of the Debtor's business.

(d) The debtor's bank accounts evidence receipts and disbursements averaging over a quarter million dollars a month during the time surrounding the filing of the petition. The Debtor regularly maintained average aggregate balances in its various bank accounts on a daily basis of substantial five-figure amounts. Although there is evidence of one or two overdrafts in some months, each was covered the next day, and nearly all have been explained to have resulted from bank error or delayed deposits. No judgments have been taken against the Debtor. The Debtor has no record of selling assets in a liquidation fashion or making other unusual transactions. To the contrary, the evidence indicates that during the time surrounding the filing of the petition, Debtor's business was expanding and that its revenues were more than adequate to meet its obligations. Its cash flow was pressed by the expense of furnishing and moving into its new offices.

(e) The Ramm companies have numerous creditors. Notwithstanding intensive solicitation by the petitioning creditors in this proceeding, no other business or trade creditors have sought to join the petition and none testified in this case that they were dissatisfied with Ramm's payment record as to them. The Court concludes that if the Debtor were not generally paying its debts as they became due, more evidence would have been forthcoming from trade creditors aside from the petitioning creditors, who themselves may be characterized as primarily former employees. See *In Re: Investment Corp. of North America*, 39 B.R. 758, 759 (Bankr.S. D.Fla.1984); *In Re: Hope Communications, Inc.*, 59 B.R. at 944.

(f) The evidence in this proceeding shows a clearly established course of conduct between the Debtor and several of its creditors allowing for payment in some instances longer than 30 days after invoice date. Having demonstrated such a course of conduct, however, the petitioning creditors should not be allowed to claim that some shorter, more stringent period of time is required for payment, in an attempt to prove the Debtor is not generally paying its debts as they become due. See *In Re: Laclede Cab Company*, 76 B.R. 687, 692 (Bankr.E.D.Mo.1987).

(g) The Debtor has obviously experienced difficulty in dealing with its employees and has made what may appear to be in retrospect poor employment and management decisions. These have caused dissatisfaction and high employee turnover. Numerous disputes have resulted regarding what amounts, if any, former employees are owed upon their termination. Such practices, even if proven, do not constitute a basis for relief under § 303(h)(1) of the Bankruptcy Code. Generally speaking, bankruptcy courts exist for two reasons: to give debtors a fresh start and to insure an orderly ranking of creditors' claims. *In Re: Central Hobron Associates*, 41 B.R. 444, 451 (D.Hawaii 1984).

13. On the basis of the evidence before it, the Court therefore concludes that the petition in the case at bar should be dismissed because the petitioning creditors have failed to satisfy the requirements of § 303(b)(1) of the Bankruptcy Code and furthermore, even if compliance under that subsection had been shown, that upon trial of the matter the petitioning creditors have failed to prove that under § 303(h)(2) of the Bankruptcy Code a custodian was appointed for the Debtor or that under § 303(h)(1) the Debtor is generally not paying its debts as they become due, except for debts that are the subject of a bona fide dispute.

14. The Court will enter a separate order in accordance with these findings of fact and conclusions of law.